1  JOHN J. FRENI, ESQ. (Bar No. 132912)
   A Professional Law Corporation
2  600 West Broadway, Suite 400
   San Diego, CA 92101
3  (619) 557-9128; (619) 515-1197

4  Attorneys for Defendant, MARIO RENDA

5

6

7

8              **UNITED STATES DISTRICT COURT**

9          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10  AIRLINES REPORTING CORPORATION, | CASE NO. 08-MC-00088

11      Plaintiff/Judgment Creditor, | DEFENDANT MARIO RENDA'S NOTICE
                                       | OF LODGMENT IN SUPPORT OF
12  v.                                 | MOTION TO VACATE JUDGMENT
                                       | PURSUANT TO FEDERAL RULES OF
13  COMMERCIAL TRAVEL               | CIVIL PROCEDURE §§ 60, SUBD. (b)(3)
    CORPORATION d/b/a MATLOCK        | and SUBD. (b)(4)
14  TRAVEL, et al.,

15      Defendants/Judgment Debtors. | Date:    July 25, 2008
                                       | Time:    10:30 a.m.
16                                     | Ctrm:    1, 4th Floor
                                       | Judge:   Hon. Irma E. Gonzalez
17
18                                     | Judgment: September 4, 2007

19          Defendant MARIO RENDA respectfully lodges the following documents in support of

20  his motion to vacate Plaintiff AIRLINES REPORTING CORPORATION's judgment:

21  **EXHIBIT 1:**    Supplemental Report and Recommendation, filed March 2, 2005, in *Airlines*

22                    *Reporting Corp. v. Uniglobe Fairway Travel, Inc., et al.*, United States

23                    District Court for the Eastern District of Virginia, Alexandria Division,

24                    Civil Action No: 1:04cv622.

25  **EXHIBIT 2:**    Order [adopting findings of fact and recommendations and dismissing case

26                    without prejudice], filed March 21, 2005, in *Airlines Reporting Corp. v.*

27                    *Uniglobe Fairway Travel, Inc., et al.*, United States District Court for the

28

                                        1

| | |
|---|---|
| 1 | Eastern District of Virginia, Alexandria Division, Civil Action |
| 2 | No: 1:04cv622. |
| 3 | **EXHIBIT 3:** First Amended Complaint, filed July 30, 2004, in *Airlines Reporting Corp.* |
| 4 | *v. Uniglobe Fairway Travel, Inc., et al.*, United States District Court for the |
| 5 | Eastern District of Virginia, Alexandria Division, Civil Action No: |
| 6 | 1:04cv622. |
| 7 | **EXHIBIT 4:** First Amended Complaint, filed July 30, 2004, in *Airlines Reporting Corp.* |
| 8 | *v. Commercial Travel Corporation d\b\a Matlock Travel, et al.*, United |
| 9 | States District Court for the Eastern District of Virginia, Alexandria |
| 10 | Division, Civil Action No: 1:04cv613. |
| 11 | **EXHIBIT 5:** Entry of Default, filed August 27, 2004, in *Airlines Reporting Corp. v.* |
| 12 | *Commercial Travel Corporation d/b/a/ Matlock Travel, et al.*, United States |
| 13 | District Court for the Eastern District of Virginia, Alexandria Division, |
| 14 | Civil Action No: 1:04cv613. |
| 15 | **EXHIBIT 6:** Report and Recommendation, filed October 22, 2004, in *Airlines Reporting* |
| 16 | *Corp. v. Commercial Travel Corporation d/b/a/ Matlock Travel, et al.*, |
| 17 | United States District Court for the Eastern District of Virginia, Alexandria |
| 18 | Division, Civil Action No: 1:04cv613. |
| 19 | **EXHIBIT 7:** Order [adopting findings of fact and recommendation of US Magistrate |
| 20 | Judge] issued September 4, 2007, in *Airlines Reporting Corp. v.* |
| 21 | *Commercial Travel Corporation d/b/a/ Matlock Travel, et al.*, United States |
| 22 | District Court for the Eastern District of Virginia, Alexandria Division, |
| 23 | Civil Action No: 1:04cv613. |
| 24 | **EXHIBIT 8:** Order [for entry of default judgment] issued September 4, 2004, in *Airlines* |
| 25 | *Reporting Corp. v. Commercial Travel Corporation d/b/a/ Matlock Travel,* |
| 26 | *et al.*, United States District Court for the Eastern District of Virginia, |
| 27 | Alexandria Division, Civil Action No: 1:04cv613. |
| 28 | / / / |

2

1   **EXHIBIT 9:**      Pacer Online Docket in *Airlines Reporting Corp. v. Uniglobe Fairway*

2                        *Travel, Inc., et al.*, United States District Court for the Eastern District of

3                        Virginia, Alexandria Division, Civil Action No: 1:04cv622.

4   **EXHIBIT 10:**     Pacer Online Docket in *Airlines Reporting Corp. v. Commercial Travel*

5                        *Corporation ,d/b/a/ Matlock Travel, et al.*, United States District Court for

6                        the Eastern District of Virginia, Alexandria Division, Civil Action No:

7                        1:04cv613.

8   Dated: June 30, 2008                      JOHN J. FRENI, ESQ.
                                               A Professional Law Corporation
9

10                                             By: s/ **JOHN J. FRENI, ESQ.**
                                                   Attorneys for Defendant, MARIO RENDA
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

1    **DEFENDANT MARIO RENDA'S NOTICE OF LODGMENT**
2    **IN SUPPORT OF MOTION TO VACATE JUDGMENT**

3    **EXHIBITS 1 - 3**

4    **EXHIBIT 1**    Supplemental Report and Recommendation, filed March 2,    **Page 1-15**

5    2005, in *Airlines Reporting Corp. v. Uniglobe Fairway*

6    *Travel, Inc., et al.*, United States District Court for the

7    Eastern District of Virginia, Alexandria Division, Civil

8    Action No: 1:04cv622.

9    **EXHIBIT 2**    Order [adopting findings of fact and recommendations and    **Page 16**

10    dismissing case without prejudice], filed March 21, 2005,

11    in *Airlines Reporting Corp. v. Uniglobe Fairway Travel,*

12    *Inc., et al.*, United States District Court for the Eastern

13    District of Virginia, Alexandria Division, Civil Action

14    No: 1:04cv622.

15    **EXHIBIT 3**    First Amended Complaint, filed July 30, 2004, in *Airlines*    **Pages 17 - 82**

16    *Reporting Corp. v. Uniglobe Fairway Travel, Inc., et al.*,

17    United States District Court for the Eastern District of

18    Virginia, Alexandria Division, Civil Action No:

19    1:04cv622.

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED
MAR - 2 2005

AIRLINES REPORTING CORP.,       )
                                )
        Plaintiff,              )
                                )
        v.                      )        CIVIL ACTION NO: 1:04cv622
                                )
UNIGLOBE FAIRWAY TRAVEL,        )
INC., *et al.*,                 )
                                )
        Defendants.             )

# SUPPLEMENTAL REPORT AND RECOMMENDATION

### I.    Procedural History

This matter was recommitted to Magistrate Judge Barry R. Poretz from District Judge

T.S. Ellis, III to evaluate, *inter alia*, whether this Court exercises personal jurisdiction over the

defendants in default, Mario Renda and Robert Kremer.

Plaintiff filed a Complaint on May 28, 2004 and a First Amended Complaint on July 30,

2004 to add Mario Renda and Robert Kremer as defendants in the action. (Dkt. nos. 1, 6). By

private process server, Plaintiff served Defendant Robert Kremer on August 3, 2004 and Mario

Renda on August 4, 2004 with a Summons and a copy of the First Amended Complaint. (Dkt.

nos. 8, 9). Defendants Mario Renda and Robert Kremer did not answer or otherwise file

responsive pleadings in this action. On Plaintiff's motion, the Clerk entered Defaults as to

Defendants Mario Renda and Robert Kremer on August 27, 2004. (Dkt. nos. 14, 15). On

September 17, 2004, Magistrate Judge Thomas R. Jones heard Plaintiff's Motion for Entry of

A TRUE COPY, TESTE:
CLERK, U.S. DISTRICT COURT

BY _____
DEPUTY CLERK

Exhibit 1
Page - 1

Default Judgment against Defendants Mario Renda and Robert Kremer. (Dkt. no. 16).

Magistrate Judge Jones took the instant Motion under advisement and directed Plaintiff to submit to the Court, within seven days, a supplemental declaration to substantiate its request for damages. On September 24, 2004, Plaintiff submitted a Supplemental Declaration of Plaintiff Regarding Breakdown of Amounts Owed in Support of Plaintiff's Motion for Entry of Default Judgment against Defendants Mario Renda and Robert Kremer ("Supplemental Declaration"). (Dkt. no. 24).

Pursuant to 28 U.S.C. Section 636(b), Magistrate Judge Poretz issued a Report and Recommendation on Plaintiff's instant Motion for Default Judgment on October 14, 2004. (Dkt. no. 25). Upon review, Judge Ellis recommitted this matter to Judge Poretz to enter supplemental findings and recommendations concerning *in personam* jurisdiction over Defendants Mario Renda and Robert Kremer, Defendants' individual liabilities under the several counts, and Plaintiff's request for a specific damage award on each count. Consistent with Judge Ellis' mandate, Judge Poretz ordered Plaintiff to supplement its instant Motion by November 23, 2004 to provide further factual and legal support. (Order, Dkt. no. 27). After the Court granted Plaintiff an time extension, Plaintiff filed a Supplemental Memorandum in Support of Plaintiff's Motion for Entry of Default Judgment Against Defendants Mario Renda and Robert Kremer ("Supplemental Memorandum") on December 13, 2004. (Dkt. no. 38). The Court further permitted Plaintiff to support the factual allegations proffered in its Supplemental Memorandum with affidavits and exhibits, and as such, Plaintiff filed a Revised Supplemental Memorandum with supporting documents on February 22, 2005. (Dkt. nos. 44, 45).

Exhibit 1
Page - 2

II.   **Factual Summary**

The following factual summary is based on Plaintiff's First Amended Complaint, Motion

for Entry of Default Judgment, Supplemental Declaration, Supplemental Memorandum, Revised

Supplemental Memorandum, and the exhibits and affidavits in support thereto. (Dkt. nos. 6, 16,

24, 38, 44, 45).

A.   General Allegations in the First Amended Complaint

Plaintiff asserts that Defendant Uniglobe Fairway Travel, Inc. ("Uniglobe") and several of

its officers and directors committed, *inter alia*, a breach of contract, breaches of fiduciary duties,

and fraud. Although Defendants Uniglobe, Robert F. Kreidler, and Anthony Renda remain as

parties in this action, only Defendants Mario Renda and Robert Kremer have defaulted (the

"Defaulting Defendants"). Upon Plaintiff's request, defendants Thomas K. Taylor, Marie A.

Taylor, Frank J. Costa, and Joseph Russell were dismissed from this action on November 10,

2004. (Dkt. nos. 29-31).

In its First Amended Complaint and Revised Supplemental Memorandum supporting its

instant Motion, Plaintiff alleges that Defendants Robert Kremer and Mario Renda committed the

following acts: breach of fiduciary duty (Count 2), conversion (Count 3), fraud (Count 4),

statutory conspiracy (Count 5), common law conspiracy (Count 5), and unjust enrichment (Count

6). (Am. Compl, Dkt. no. 6, ¶¶ 69-131; Rev. Supp. Mem., Dkt. no. 44 at 9-13).

To form the factual bases for its allegations against the Defaulting Defendants, Plaintiff

avers that it entered into an Agent Reporting Agreement (ARA) with the corporate Defendant

Uniglobe on May 10, 1983. (Am. Compl., Dkt. no. 6, ¶¶ 31-32). Sometime in or around 2000,

Defendant Uniglobe's then-owners, Thomas K. Taylor and Marie A. Taylor, transferred

3

Exhibit 1
Page - 3

ownership of Uniglobe to Defendants James Kreidler, Robert Kremer, Mario Renda and/or Anthony Renda without the pre-approval of Plaintiff pursuant to the terms of Uniglobe's ARA with Plaintiff. (Am. Compl., Dkt. no. 6, ¶¶ 34-35).

Although Defendants Robert Kremer and Mario Renda did not execute the ARA on behalf of Defendant Uniglobe, Plaintiff contends that the Defaulting Defendants operated Uniglobe with other defendants, had access to ticket stock and plates, and were involved in the preparation of Uniglobe's weekly sales reports to Plaintiff. (Am. Compl., Dkt. no. 6, ¶¶ 21-22). Through their operation, Plaintiff further argues that the Defaulting Defendants operated Uniglobe as an unapproved travel agency, and failed to adhere to the ARA by not submitting accurate weekly sales reports or forwarding to Plaintiff their share of the proceeds from Uniglobe's sale of Plaintiff's traffic documents. (Am. Compl., Dkt. no. 6, ¶¶ 36-37). Plaintiff requests that a default judgment be entered against the Defaulting Defendants Renda and Kremer in the amount of $1,118,370.72. (Mot. for Default J., Dkt. no. 16, ¶ 1).

      B.    Jurisdiction

Subject matter jurisdiction in this action is founded on diversity of citizenship under 28 U.S.C. Section 1332. As alleged, Plaintiff is a Delaware corporation with its principal place of business in Arlington, Virginia, all Defendants are citizens of California, and the amount in controversy exceeds $75,000. (Am. Compl, Dkt. no. 6, ¶¶ 1-10).

Plaintiff contends that personal jurisdiction over the defaulting Defendants Renda and Kremer is appropriate under Virginia's long-arm statute, Virginia Code Section 8.01-328.1, and consistent with the dictates of due process based on their contacts with Virginia. (Am. Compl., Dkt. no. 6, ¶ 28).

4

Exhibit 1
Page - 4

1.      *Plaintiff's Factual Bases for Personal Jurisdiction*

Plaintiff, operating out of Virginia, and Defendant Uniglobe, operating in California, entered into the ARA on May 10, 1983. (Am. Compl., Dkt. no. 6, ¶¶ 31-32). By 2002, Aloha Continental Tours & Travel ("Aloha"), a company operating out of Santa Ana, California, had owned and operated Defendant Uniglobe as a wholly-owned subsidiary. (Rev. Supp. Mem., Dkt. no. 44 at 2, ex. A Russell Aff. at ¶ 2, ex. B Taylor Aff. at ¶ 3, ex. 3 Costa Aff. at ¶ 3).[1] Aloha also owned and operated, A Better Airfare, which had substantial operations and a call-in reservation center in Newport News, Virginia. (Rev. Supp. Mem., Dkt. no. 44 at 2, ex. C at ¶ 4). As alleged, both Defaulting Defendants Renda and Kremer exercised full control over the daily operations of Aloha's companies from its base of operations in California: Defendant Renda was the Chairman and financial backer of Aloha, and Defendant Kremer held the title of Managing Director. (Rev. Supp. Mem., Dkt. no. 44 at 2, ex. A Russell Aff. at ¶¶ 4-5, ex. B Taylor Aff. at ¶¶ 5-6, ex. C Costa Aff. at ¶¶ 5-6).

With respect to Defendant Uniglobe, Plaintiff similarly alleges that both Defaulting Defendants Renda and Kremer have been "officer[s] and/or principal[s] of UNIGLOBE" and hold "ownership interest[s] in UNIGLOBE." (Am. Compl., Dkt. no. 6, ¶¶ 13,14). As part of their operation of Aloha, Plaintiff contends that from California Defendants Renda and Kremer

---

[1] Plaintiff's allegations regarding the ownership of Defendant Uniglobe are inconsistent. Plaintiff variously alleges that: (a) around 2000 former defendants Thomas Taylor and Marie Taylor "sold/or transferred ownership of Uniglobe to Defendants James F. Kriedler, Robert Kremer, Mario Renda and/or Anthony Renda" (Am. Compl., Dkt. no. 6,¶ 34); (b) Thomas Taylor and Marie Taylor both still "holds an ownership interest in Uniglobe" (Am. Compl., Dkt. no. 6, ¶¶ 11-12); and (c) "Aloha owned and operated Uniglobe as a wholly-owned subsidiary." (Rev. Supp. Mem., Dkt. no. 44 at 2, ex. A Russell Aff. at ¶ 2, ex. B Taylor Aff. at ¶ 3, ex. C Costa Aff. at ¶ 3).

Exhibit 1
Page - 5

directed activities into Virginia through Defendant Uniglobe by:

- ordering ticket stock from Plaintiff's headquarters in Arlington, Virginia,
- submitting false sales' reports to Plaintiff in Virginia, and
- communicating with "persons at ARC's Arlington, Virginia location."

(Rev. Supp. Mem., Dkt. no. 44 at 8). Through these actions, Plaintiff contends that the

Defaulting Defendants "necessarily acceded" to the ARA between Plaintiff and Defendant

Uniglobe even though Defendants Renda and Kremer did not execute the ARA. (Rev. Supp.

Mem., Dkt. no. 44 at 8-9). Similarly, through the Defaulting Defendants' work at Aloha,

Plaintiff argues that Aloha's subsidiary, A Better Airfare, with an office in Newport News,

Virginia, made tax payments to the Treasurer of Virginia and the City of Hampton Roads and

operated a computer reservation system there. (Rev. Supp. Mem., Dkt. no. 44 at 8).

     2.    *Plaintiff's Legal Arguments Supporting Personal Jurisdiction*

    Plaintiff argues that Virginia's long-arm statute confers personal jurisdiction over the

Defaulting Defendants because the cause of action arises directly from their (1) transacting

business in the Commonwealth, (2) causing tortious injury in the Commonwealth by an act or

omission in the Commonwealth, and (3) causing a tortious injury in the Commonwealth through

tortious conduct outside of the Commonwealth where they regularly solicited business, derived

substantial revenue from, and engaged in other persistent course of conduct in the

Commonwealth. Va. Code. Ann. § 8.01-328.1(A)(1), (3), (4). Plaintiff argues further that the

long-arm statute confers personal jurisdiction over the Defaulting Defendants because they used

"a computer or computer network located in the Commonwealth." Va. Code Ann. § 8.01-

328.1(B).

    Plaintiff also contends that this Court has personal jurisdiction over the Defaulting

6

Exhibit 1
Page - 6

Defendants through their contacts in the Commonwealth based on the due process clause of the

Fourteenth Amendment. Plaintiff claims that the Defaulting Defendants, operating from

California through Aloha, the parent company of Defendant Uniglobe, purposefully availed

themselves to jurisdiction in Virginia by, *inter alia*, ordering ticket stock from, submitting false

sales' reports to, and communicating with Plaintiff at their Arlington, Virginia location.

Moreover, Plaintiff suggests that the Defaulting Defendants further directed activity into Virginia

by operating Aloha, which possessed the company, A Better Airfare–which had some operations

in Virginia.

### III.    Findings

The Magistrate Judge finds that this Court cannot exercise personal jurisdiction over

Defendants Mario Renda and Robert Kremer because these defendants lack sufficient minimum

contacts with Virginia.

### A.    Raising Personal Jurisdiction *Sua Sponte*

This Court may raise the issue of personal jurisdiction over Defendants Renda and

Kremer *sua sponte*. The requirement that a court have personal jurisdiction over a defendant is

grounded in the Due Process Clause. *Foster v. Arletty 3 Sarl*, 278 F.3d 409, 413 (4th Cir. 2002)

(citing *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) ("[T]he

requirement that a court have personal jurisdiction flows from the Due Process Clause and

protects an individual liberty interest.")). Accordingly, the burden of proving jurisdictional facts

lies with the plaintiff. *Le Donne v. Gulf Air, Inc.*, 700 F. Supp. 1400, 1411 (E.D. Va. 1988)

("Plaintiff bears the burden of demonstrating personal jurisdiction once the exercise of

jurisdiction has been questioned.") (citing *Haynes v. James H. Carr, Inc.*, 427 F.2d 700, 704 (4th

7

Exhibit 1
Page - 7

Cir. 1970), *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189 (1936)).

Where a plaintiff seeks a judgment by default against a defaulting defendant, a district

court must determine whether it has personal jurisdiction over the defaulting defendant:

> [A] judgment entered without personal jurisdiction is void. It should therefore be
> apparent that a district court has the duty to assure that it has the power to enter a
> valid default judgment. . . When entry of default is sought against a party who has
> failed to plead or otherwise defend, the district court has an affirmative duty to
> look into its jurisdiction both over the subject matter and the parties.

*System Pipe & Supply, Inc. v. M/V VIKTOR KURNATOVSKIY,* 242 F.3d 322, 324 (5th Cir. 2001)

(holding that a district court may raise the issue of personal jurisdiction *sua sponte*) (internal

citations omitted); *Dennis Garberg & Assoc., Inc. v. Pack-Tech Int'l Corp.,* 115 F.3d 767, 772

(10th Cir. 1997) ("[A] district court must determine whether it has jurisdiction over the defendant

before entering judgment by default against a party who has not appeared in the case.") (citing

*Williams v. Life Sav. and Loan,* 802 F.2d 1200, 1203 (10th Cir. 1986)); *In re Tuli,* 172 F.3d 707,

712 (9th Cir. 1999)("[W]hen a court is considering whether to enter a default judgment, it may

dismiss an action *sua sponte* for lack of personal jurisdiction."); *Whittaker v. Winner,* 264 F.

Supp. 2d 281, 281 (D. Md. 2003) (finding that dismissal was appropriate, *sua sponte,* for lack of

personal jurisdiction where there were no allegations of personal jurisdiction in the complaint

and plaintiff failed to verify personal jurisdiction upon the court's request); 20 Wright & Miller,

Fed. Prac. and Pro. § 8 (2004) ("The court, whether trial or appellate, is obliged to notice want of

jurisdiction on its own motion.") See also, *Pilgrim Badge & Label Corp. v. Barrios,* 857 F.2d 1,

4 (1st Cir. 1988); *Reynolds v. Int'l Amateur Athletic Fed'n,* 23 F.3d 1110, 1120 (6th Cir. 1994).

B.    Analytical Framework for Personal Jurisdiction

Federal Rule of Civil Procedure 4(k)(1)(A) permits a federal court to exercise personal

8

Exhibit 1
Page - 8

jurisdiction in the same manner as the forum's state courts. For a state court to exercise personal

jurisdiction, the court must find that a state statute confers jurisdiction, and that the exercise of

jurisdiction is consistent with the Fourteenth Amendment's due process requirements.

*D'Addario v. Geller*, 264 F. Supp. 2d 367, 378 (E.D. Va. 2003). Similarly, where this Court is

asked to exercise personal jurisdiction over nonresident defendants, this Court must examine

whether the defendant's conduct falls within the reach of Virginia's long-arm statute, and

whether the exercise of personal jurisdiction over the defendant violates due process:

> The Fourth Circuit has laid out the analysis that courts should apply when
> determining whether personal jurisdiction can be obtained pursuant to a long-arm
> statute. The Court must first "determine whether the statutory language applies to
> [each] defendant; second, if the statutory language applies, [the court] must
> determine whether the statutory assertion is consistent with the due process clause
> of the Constitution."

*Geller*, 264 F. Supp. 2d at 378 (quoting *English & Smith v. Metzger*, 901 F.2d 36, 38 (4th Cir.

1990)).

Virginia's long-arm statute extends jurisdiction to the fullest extent permitted by the Due

Process Clause. *Id.* For this reason, a court need not apply the traditional two-step analysis

formulaically, but may consider first whether a statutory assertion is consistent with the due

process clause:

> Because Virginia's long-arm statute extends personal jurisdiction to the extent
> permitted by the Due Process Clause, the statutory inquiry necessarily merges with
> the constitutional inquiry, and the two inquiries essentially become one. The
> question, then, is whether the defendant has sufficient minimum contacts with [the
> forum] such that the maintenance of the suit does not offend traditional notions of
> fair play and substantial justice.

*Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002) (internal citations omitted); See

also, *Bassett Furniture Indus., Inc. v. Sexton*, 596 F. Supp. 454, 456 (W.D. Va. 1984) (dispensing

9

Exhibit 1
Page - 9

with traditional two-step analysis and examining the due process step first because Virginia's long-arm statute is limited by the parameters of due process).

Where a defendant maintains systematic and continuous contacts with Virginia, the court could exercise general personal jurisdiction over the defendant for his acts committed either inside or outside of Virginia. *Id.* at 378-79 (citing *Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 450 (4th Cir. 2000). Otherwise, a court may exercise specific personal jurisdiction over the defendant where his contacts "relate to the cause of action and create a substantial connection with the forum." *Id.*

For this Court to exercise personal jurisdiction over a nonresident defendant pursuant to the Due Process Clause of the Fourteenth Amendment, the defendant must have "sufficient minimum contacts" with the forum state, such that maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). To satisfy due process when evaluating specific personal jurisdiction over the nonresident defendant, this court must consider the nature and quality of the defendant's significant contacts with Virginia in relation to the specific cause of action. *Production Group*, 337 F. Supp. 2d at 793-94; *Heathmount A.E. Corp v. Technodome.com*, 106 F. Supp. 2d 860, 865 (E.D. Va. 2000). Within the context of specific personal jurisdiction, the Fourth Circuit examines:

> (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable.

*Mitrano v. Hawes*, 377 F.3d 402, 407 (4th Cir. 2004) (internal citations omitted).

10

Exhibit 1
Page - 10

As a general rule, due process is satisfied when a nonresident defendant purposefully conducts activities within the forum, benefits from the privileges and protections of the forum state, and as a result, has clear notice that he could be subject to suit there. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) ("[T]here must be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws."); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (The nonresident defendants' contacts with the forum State must be such that the defendants "should reasonably anticipate being haled into court there."). However, the nonresident defendant's contacts may not be based on random, fortuitous, or attenuated contacts:

> This "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person. Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State. Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Burger King*, 471 U.S. at 475-76 (internal citations omitted).

If a court decides that a defendant purposefully established minimum contacts with the forum state, then the court may consider whether the exercise of personal jurisdiction over the defendant comports with "fair play and substantial justice." *Id.* at 476-77. The factors to consider include the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, and the policy interest in obtaining the most efficient resolution. *Id.* (internal citations omitted).

11

Exhibit 1
Page - 11

C.    Analysis

The Magistrate Judge finds that it would violate due process for this court, sitting in the Eastern District of Virginia, to exercise jurisdiction over Defendants Mario Renda and Robert Kremer.

Plaintiff has alleged that the Defaulting Defendants, from California, directed the following business-related acts to Virginia:  ordering ticket stock from Plaintiff, submitting false sales' reports to Plaintiff, and communicating with Plaintiff.  The Defaulting Defendants committed these acts while "officers and/or principals" of Defendant Uniglobe, and as a consequence, had undertaken express fiduciary duties to hold in trust ARC's traffic documents. (Am. Compl., Dkt. no. 6, ¶¶ 72-73, 77-78).

Because there are no valid grounds to assert general personal jurisdiction over the Defaulting Defendants, this Court must consider the nature and quality of the Defaulting Defendants' contacts with Virginia as they relate to the cause of action.  See *Geller*, 264 F. Supp. 2d at 378-79.  The gravamen of Plaintiff's cause relates to actions of Defendant Uniglobe and the other Defendants with respect to the ARA between Uniglobe and Plaintiff.  Any contacts in Virginia involving Aloha's wholly-owned subsidiary, A Better Airfare, are too attenuated to be factored into the minimum contacts' analyses for specific personal jurisdiction over the Defaulting Defendants.  Simply put, A Better Airfare's contacts with Virginia do not relate to Plaintiff's action against the Defaulting Defendants, and as such, its contacts may not be attributed to the Defaulting Defendants.

The Plaintiff acknowledges that Defendants Mario Renda and Robert Kremer did not execute the ARA between Defendant Uniglobe and Plaintiff, and does not assert its first count,

12

Exhibit 1
Page - 12

Breach of Contract (Count 1), against them. (Am. Compl., Dkt. no. 6, ¶¶ 60-68) (asserting that former Defendants Marie A. Taylor, Thomas K. Taylor, Joseph Russell, and Frank J. Costa and current Defendant Uniglobe breached the ARA with Plaintiff). Rather, Plaintiff argues that the Defaulting Defendants "necessarily acceded" to the ARA between Plaintiff and Defendant Uniglobe because Uniglobe was acquired by Aloha where Defendant Mario Renda was Chairman and Defendant Robert Kremer was Managing Director. (Rev. Supp. Mem., Dkt. no. 44 at 8). On the premise that the Defaulting Defendants' ratified the ARA, Plaintiff asks that this Court exercise its jurisdictional power over the Defaulting Defendants because they ordered ticket stock from Plaintiff's business location in Virginia, submitted false sales' reports to Plaintiff's business location in Virginia, and called individuals at Plaintiff's business location in Virginia. (Rev. Supp. Mem., Dkt. no. 44 at 8).

In *Le Bleu Corp. v. Standard Capital Group, Inc.*, the Fourth Circuit Court of Appeals applied the minimum contacts analysis where a contract was signed in the forum state and the California defendant visited plaintiff twice in the forum state, exchanged communications between California and the forum state, and mailed a payment to the plaintiff in the forum state. *Le Bleu Corp. v. Standard Capital Group, Inc.* 11 Fed.Appx. 377, 380, 2001 WL 672066, *1-2 (4th Cir. 2001). The Fourth Circuit, noting that a defendant's contract with a resident in a forum state does not automatically give rise to specific personal jurisdiction, affirmed that the defendant's contacts were only negligible, and as such, did not give rise to personal jurisdiction. *Id.* (citing *Burger King*, 471 U.S. at 478); See also, *Autoscribe Corp. v. Goldman and Steinberg*, 47 F.3d 1164, 1995 WL 56662, at *1 (4th Cir. 1995) (finding a lack of minimum contacts over a nonresident defendant where it entered into a licensing agreement with the plaintiff who would

13

Exhibit 1
Page - 13

provide services from the forum state, telephoned the plaintiff in the forum state, and requested sales information from the plaintiff in the forum state).

Like *Le Bleu*, the Magistrate Judge finds that the Defaulting Defendants' contacts with Virginia are only negligible and lack sufficient cause for this Court to restrain the Defaulting Defendants' liberty interests by compelling them to submit to the jurisdiction of this Court. The Defaulting Defendants alleged minimum contacts do not connote that they purposefully directed activities into Virginia to such an extent they should reasonably expect to be subject to suit here. As alleged, Defendants Mario Renda and Robert Kremer, as officers of Aloha which owned Defendant Uniglobe as a wholly-owned subsidiary, performed certain administrative tasks in furtherance of the ARA–like ordering ticket stock, mailing sales reports, and contacting Plaintiff. Like *Le Bleu*, the Defaulting Defendants exchanged communications and documents from California to the forum state.

Unlike *Le Bleu*, however, the Defaulting Defendants did not even sign the contract or visit the forum state in connection with the contract. Assuming that the Defaulting Defendants' did accept and ratify the ARA through their actions, their contacts with Virginia are even less than those presented in *Le Bleu*. Consequently, it is presumptively unreasonable to require anyone to submit to the jurisdiction of a foreign court where, as here, the contacts are limited merely to exchanging communications with an entity in the foreign state (*i.e.*, ordering stock, submitting reports, and contacting via telephone). In other words, the Defaulting Defendants' contacts are at most, negligible and, at best, attenuated. For these reasons, it would violate due process to require Defendants Mario Renda and Robert Kremer to submit to the burden of litigating this action in Virginia.

14

Exhibit 1
Page - 14

## IV.    Conclusion and Recommendation

The Magistrate Judge concludes that this Court lacks personal jurisdiction over

Defendants Mario Renda and Robert Kremer based on their insufficient contacts with this forum.

Consequently, the Magistrate Judge recommends that this action be dismissed without prejudice

as to Defendants Mario Renda and Robert Kremer.

## V.    Notice

All the parties, Plaintiff, Defendant Mario Renda, Defendant Robert Kremer, and the

remaining Defendants (Uniglobe Fairway Travel, Inc., James F. Kreidler, and Anthony Renda)

are advised that exceptions to this Supplemental Report and Recommendation pursuant to 28

U.S.C. Section 636 and Federal Rule of Civil Procedure 72(b) must be filed within ten (10) days

after service.  A failure to object waives appellate review of a judgment based on this

Supplemental Report and Recommendation.


_____

Barry R. Poretz
United States Magistrate Judge



March 2, 2005
Alexandria, Virginia


15

Exhibit 1
Page - 15

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

AIRLINES REPORTING CORPORATION,    )
    **Plaintiff,**    )
    )
    v.    )    Civil Action No. 1:04cv622
    )
UNIGLOBE FAIRWAY TRAVEL, INC., et al.,  )
    **Defendants.**    )

## ORDER

Upon consideration of the March 2, 2005 Report and Recommendation of the United States Magistrate Judge designated to conduct a hearing in this matter, no objections having been filed, and upon an independent *de novo* review of the record, it is hereby **ORDERED** that the Court adopts as its own the findings of fact and recommendation of the United States Magistrate Judge, as set forth in the March 2, 2005 Report and Recommendation.

Accordingly, it is hereby **ORDERED** that the instant action is **DISMISSED** without prejudice as to defendants Mario Renda and Robert Kremer based on a lack of personal jurisdiction.

The Clerk is **DIRECTED** to send a copy of this Order to defendants and to all counsel of record.

T. S. Ellis III
United States District Judge

Alexandria, VA
March 21, 2005

A TRUE COPY, TESTE:
CLERK, U.S. DISTRICT COURT

BY_____
DEPUTY CLERK

Exhibit 2
Page - 16

49

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

2004 JUL 30 P 2 29

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

AIRLINES REPORTING CORPORATION        :
A Delaware Corporation                :
4100 North Fairfax Drive; Suite 600   :
Arlington, Virginia  22203,           :
                                      :
                    Plaintiff,        :
                                      :     Civil Action No.:  1:04cv622
v.                                    :
                                      :
UNIGLOBE FAIRWAY TRAVEL, INC.,        :
                                      :
        AND                           :
                                      :
THOMAS K. TAYLOR,                     :
                                      :
        AND                           :
                                      :
MARIE A. TAYLOR,                      :
                                      :
        AND                           :
                                      :
FRANK J. COSTA,                       :
                                      :
        AND                           :
                                      :
JAMES F. KREIDLER,                    :
                                      :
        AND                           :
                                      :
ANTHONY RENDA,                        :
                                      :
        AND                           :
                                      :
ROBERT KREMER                         :
5212 Chelsea Street                   :
La Jolla, California  92037,          :
                                      :
        AND                           :
                                      :
MARIO RENDA                           :
5212 Chelsea Street                   :
La Jolla, California  92037,          :

A TRUE COPY, TESTE:
CLERK, U.S. DISTRICT COURT

BY _____
        DEPUTY CLERK

Exhibit 3
Page - 17



                                        :
        AND                             :
                                        :
JOSEPH RUSSELL                          :
7084 Miramar Road, Suite 100            :
San Diego, California  92121,           :
                                        :
                Defendants.             :

## FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff, Airlines Reporting Corporation (hereinafter referred to as "ARC"), by and through counsel, BONNER KIERNAN TREBACH & CROCIATA, and alleges as its First Amended Complaint as follows:

## THE PARTIES

1.      ARC is a Delaware corporation with its principal place of business at 4100 N. Fairfax Drive, Suite 600, Arlington, Virginia, 22203.

2.      Upon information and belief, DEFENDANT UNIGLOBE FAIRWAY TRAVEL, INC. (hereinafter "UNIGLOBE") is a California corporation with its principal place of business in San Diego, California.

3.      DEFENDANT THOMAS K. TAYLOR is an adult individual whose last known address is 723 Rivertree Drive, Oceanside, California 92054.

4.      DEFENDANT MARIE A. TAYLOR is an adult individual whose last known address is 723 Rivertree Drive, Oceanside, California 92054.

5.      DEFENDANT FRANK J. COSTA is an adult individual whose last known address is 8723 Stipa Court, San Diego, California  92129.

6.      Upon information and belief, DEFENDANT JAMES F. KREIDLER is an adult individual whose last known address is 7084 Miramar Road, San Diego, California 92121.

Exhibit 3
Page - 18

2

109927-1

7.    Upon information and belief, DEFENDANT ANTHONY RENDA is an adult individual whose last known address is 7084 Miramar Road, San Diego, California 92121.

8.    DEFENDANT ROBERT KREMER is an adult individual whose last known address is 5212 Chelsea Street, La Jolla, California 92037.

9.    DEFENDANT MARIO RENDA is an adult individual whose last known address is 5212 Chelsea Street, La Jolla, California 92037.

10.    DEFENDANT JOSEPH RUSSELL is an adult individual whose last known address is 7084 Miramar Road, San Diego, California 92121.

11.    Upon information and belief, at all relevant times, DEFENDANT THOMAS K. TAYLOR has been an officer and/or principal of UNIGLOBE, and holds an ownership interest in UNIGLOBE.

12.    Upon information and belief, at all relevant times, DEFENDANT MARIE A. TAYLOR has been an officer and/or principal of UNIGLOBE, and holds an ownership interest in UNIGLOBE.

13.    Upon information and belief, at all relevant times, DEFENDANT ROBERT KREMER has been an officer and/or principal of UNIGLOBE, and holds an ownership interest in UNIGLOBE.

14.    Upon information and belief, at all relevant times, DEFENDANT MARIO RENDA has been an officer and/or principal of UNIGLOBE, and holds an ownership interest in UNIGLOBE.

15.    Upon information and belief, at all relevant times, DEFENDANT JOSEPH RUSSELL has been an officer and/or principal of UNIGLOBE.

Exhibit 3
Page - 19

3

109927-1

16.     Upon information and belief, at all relevant times, DEFENDANT JAMES F. KREIDLER has been an officer and/or principal of UNIGLOBE, and holds an ownership interest in UNIGLOBE.

17.     Upon information and belief, at all relevant times, DEFENDANT ANTHONY RENDA has been an officer and/or principal of UNIGLOBE, and holds an ownership interest in UNIGLOBE.

18.     Upon information and belief, at all relevant times, DEFENDANT THOMAS K. TAYLOR has operated the travel agency, has had access to ticket stock and plates, and has been involved in the preparation of weekly sales reports to ARC.

19.     Upon information and belief, at all relevant times, DEFENDANT MARIE A. TAYLOR has operated the travel agency, has had access to ticket stock and plates, and has been involved in the preparation of weekly sales reports to ARC.

20.     Upon information and belief, at all relevant times, DEFENDANT FRANK J. COSTA has been manager of the travel agency, has had access to ticket stock and plates, and has been involved in the preparation of weekly sales reports to ARC.

21.     Upon information and belief, at all relevant times, DEFENDANT ROBERT KREMER has operated the travel agency, has had access to ticket stock and plates, and has been involved in the preparation of weekly sales reports to ARC.

22.     Upon information and belief, at all relevant times, DEFENDANT MARIO RENDA has operated the travel agency, has had access to ticket stock and plates, and has been involved in the preparation of weekly sales reports to ARC.

Exhibit 3
Page - 20

4

109927-1

23.     Upon information and belief, at all relevant times, DEFENDANT JOSEPH RUSSELL has operated the travel agency, has had access to ticket stock and plates, and has been involved in the preparation of weekly sales reports to ARC.

24.     Upon information and belief, at all relevant times, DEFENDANT JAMES F. KREIDLER has operated the travel agency, has had access to ticket stock and plates, and has been involved in the preparation of weekly sales reports to ARC.

25.     Upon information and belief, at all relevant times, DEFENDANT ANTHONY RENDA has operated the travel agency, has had access to ticket stock and plates, and has been involved in the preparation of weekly sales reports to ARC.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction on the basis of the diversity of citizenship of the parties.   28 U.S.C. §1332.   The amount in controversy, exclusive of interest and costs, exceeds the sum of Seventy-Five Thousand and 00/100 Dollars ($75,000).

27.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(2).

28.     This Court has personal jurisdiction over the Defendants pursuant to Va. Code § 8.01-328.1 and on the basis of Defendants' contacts with this forum.

## FACTS COMMON TO COUNTS ONE THROUGH SEVEN

29.     ARC serves as a national clearinghouse for issuing documents and other forms ("ARC traffic documents") to travel agents to be used as air passenger tickets by the travel agents' customers.

30.     ARC maintains an agency list of persons and entities qualified to serve as travel agents and issue ARC traffic documents.

Exhibit 3
Page - 21

109927-1

31.    ARC enters into Agent Reporting Agreements ("ARA") with the travel agents which govern the issuance of ARC traffic documents. The Agreement between ARC and UNIGLOBE is attached as Exhibit 1 to the Complaint, and incorporated herein by reference.

32.    Upon application for accreditation, ARC approved UNIGLOBE on May 10, 1983 for the receipt of ARC traffic documents.

33.    In order to maintain accreditation, ARC periodically requires agencies to execute a Memorandum of Agreement to the ARA. Effective May 5, 2003, DEFENDANT THOMAS K. TAYLOR entered the most recent ARA with ARC on behalf of UNIGLOBE. A copy of the Memorandum of Agreement Executed by DEFENDANT THOMAS K. TAYLOR on behalf of UNIGLOBE is attached hereto as Exhibit 2, and incorporated herein by reference.

34.    Upon information and belief, in or around 2000, DEFENDANTS THOMAS K. TAYLOR and MARIE A. TAYLOR sold and/or transferred ownership of UNIGLOBE to DEFENDANTS JAMES F. KREIDLER, ROBERT KREMER, MARIO RENDA, and/or ANTHONY RENDA.

35.    Under the ARA, all changes in travel agency ownership must be pre-approved by ARC in order to be valid for the purpose of, among other things, the issuance of ARC traffic documents.

36.    DEFENDANTS THOMAS K. TAYLOR and MARIE A. TAYLOR did not seek ARC's pre-approval for, and ARC did not approve, the ownership change between DEFENDANTS THOMAS K. TAYLOR and MARIE A. TAYLOR and DEFENDANTS JAMES F. KREIDLER, ROBERT KREMER, MARIO RENDA, and/or ANTHONY RENDA. Accordingly, under the ARA, DEFENDANTS THOMAS K. TAYLOR and

Exhibit 3
Page - 22

109927-1

MARIE A. TAYLOR remained bound to the terms of the ARA to, among other things, submit accurate and complete weekly sales reports, and ensure that the funds generated from the sale of ARC traffic documents were made available to ARC.

37.    Upon information and belief, DEFENDANTS JAMES F. KREIDLER, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, and/or ANTHONY RENDA have since operated UNIGLOBE as an unapproved travel agency.

38.    Upon information and belief, the unauthorized sale and/or transfer of ownership of UNIGLOBE effected a turnover of day-to-day operations from DEFENDANTS THOMAS K. TAYLOR and MARIE A. TAYLOR to DEFENDANTS JAMES F. KREIDLER, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, and/or ANTHONY RENDA, in violation of the ARA.

39.    Under the ARA, DEFENDANT UNIGLOBE, and DEFENDANTS THOMAS K. TAYLOR and MARIE A. TAYLOR, are required to hold ARC traffic documents in trust for ARC.

40.    The ARA also required DEFENDANT UNIGLOBE, and DEFENDANTS THOMAS K. TAYLOR and MARIE A. TAYLOR, to hold proceeds from all sales of ARC traffic documents in trust.

41.    Under the ARA, DEFENDANT MARIE A. TAYLOR was required to file weekly sales reports detailing all ARC traffic documents issued to DEFENDANT UNIGLOBE clients during the preceding period.

42.    Under the ARA, DEFENDANT THOMAS K. TAYLOR was required to file weekly sales reports detailing all ARC traffic documents issued to DEFENDANT UNIGLOBE clients during the preceding period.

Exhibit 3
Page - 23

7

109927-1

43.    Under the ARA, DEFENDANT ROBERT KREMER was required to file weekly sales reports detailing all ARC traffic documents issued to DEFENDANT UNIGLOBE clients during the preceding period.

44.    Under the ARA, DEFENDANT MARIO RENDA was required to file weekly sales reports detailing all ARC traffic documents issued to DEFENDANT UNIGLOBE clients during the preceding period.

45.    The ARA further required that DEFENDANT MARIE A. TAYLOR, as an individual who concurred in the adoption of the contract, be responsible for the accuracy of the weekly sales reports.

46.    The ARA further required that DEFENDANT THOMAS K. TAYLOR, as the individual who concurred in the adoption of the contract, be responsible for the accuracy of the weekly sales reports.

47.    DEFENDANT FRANK J. COSTA, as manager of the agency, was also authorized to prepare and was responsible for the preparation and accuracy of the weekly sales reports.

48.    DEFENDANT ROBERT KREMER, as officer and/or principal of the agency, was also authorized to prepare and was responsible for the preparation and accuracy of te weekly sales reports.

49.    DEFENDANT MARIO RENDA, as officer and/or principal of the agency, was also authorized to prepare and was responsible for the preparation and accuracy of te weekly sales reports.

Exhibit 3
Page - 24

109927-1

50.    DEFENDANT JOSEPH RUSSELL, as officer and/or principal of the agency, was also authorized to prepare and was responsible for the preparation and accuracy of te weekly sales reports.

51.    DEFENDANT UNIGLOBE's sales reports, and the amounts set forth therein, serve to authorize the ARC area bank to draw a check on the UNIGLOBE account in the appropriate amount payable to ARC.

52.    Upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, and FRANK J. COSTA purposefully failed to include in the required weekly sales reports to ARC all sales of air transportation tickets and ancillary services issued by DEFENDANT UNIGLOBE on ARC traffic documents.

53.    Upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, and FRANK J. COSTA had, on numerous occasions, purposefully failed to report properly all of the sales as required by the ARA and to make payment therefor (the "Unreported Sales") in an amount not less than One Thousand, Six Hundred Forty and 01/Dollars ($1,640.01).

54.    In addition, upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, and FRANK J. COSTA have reported certain sales to ARC, for which they failed to make funds available as required by Section VII.B of the ARA (the "Dishonored Drafts") in an amount not less than One Million, One Hundred Twelve Thousand, Three Hundred Ninety-Four and 21/00 Dollars ($1,112,394.21).

Exhibit 3
Page - 25

9

109927-1

55.     Upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA purposefully deprived ARC of monies due from ticket sales by diverting funds to themselves.

56.     DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, JAMES F. KREIDLER, ROBERT KREMER, MARIO RENDA, and ANTHONY RENDA as the principals and/or owners of DEFENDANT UNIGLOBE, and DEFENDANTS JOSEPH RUSSELL and FRANK J. COSTA, as agents/employees of DEFENDANT UNIGLOBE, purposefully deprived ARC of monies due from the proceeds on ARC traffic document sales by allowing the mishandling of funds in the agency account established for the benefit of ARC.

57.     On or about October 17, 2003, the ARA between ARC and UNIGLOBE was terminated.

58.     As a consequence of the foregoing and taking into account all payments and credits, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, ANTHONY RENDA, and UNIGLOBE remain indebted to ARC in an amount not less than One Million, One Hundred Eighteen Thousand, Three Hundred Seventy and 72/00 Dollars ($1,118,370.72).

59.     ARC has demanded that DEFENDANT UNIGLOBE and DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA pay this amount and such demand has been denied.

Exhibit 3
Page - 26

10                                                          109927-1

## COUNT ONE: BREACH OF CONTRACT

60.     ARC repeats and realleges the allegations and averments set forth in Paragraphs 1 through 59 of this Complaint as if fully set forth herein.

61.     DEFENDANTS MARIE A. TAYLOR and THOMAS K. TAYLOR knew or should have known that the ARA governed the operation of DEFENDANT UNIGLOBE in order to retain ARC accreditation. DEFENDANT THOMAS K. TAYLOR, as an owner and officer of UNIGLOBE, signed the ARA for UNIGLOBE.

62.     In violation of Section VIII of the ARA, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, JOSEPH RUSSELL, and FRANK J. COSTA failed to report all of DEFENDANT UNIGLOBE's sales of ARC traffic documents and failed to reimburse ARC for the Unreported Sales in an amount not less than One Thousand, Six Hundred Forty and 01/Dollars ($1,640.01).

63.     On numerous occasions, DEFENDANTS MARIE A. TAYLOR and THOMAS K. TAYLOR failed to make funds available to ARC on reported sales of ARC traffic tickets, resulting in Dishonored Drafts in an amount not less than One Million, One Hundred Twelve Thousand, Three Hundred Ninety-Four and 21/00 Dollars ($1,112,394.21), violating Section VII.B of the ARA.

64.     DEFENDANTS MARIE A. TAYLOR and THOMAS A. TAYLOR breached Sections VII.K and VII.L of the ARA by using, and/or allowing to be used, a credit card issued in the name of individual(s) selling ARC traffic documents and/or third-party credit card holders, and further by failing to identify such sales to ARC.

65.     DEFENDANTS MARIE A. TAYLOR and THOMAS K. TAYLOR, as owners of DEFENDANT UNIGLOBE, and DEFENDANTS JOSEPH RUSSELL and FRANK J.

Exhibit 3
Page - 27

11

109927-1

COSTA, as agents/employees of DEFENDANT UNIGLOBE, purposefully defrauded ARC by, among other things: issuing ARC documents against a credit card without the cardholder's authority, or against a stolen or otherwise fraudulent credit card; using credit cards which were issued in the name of a third party for the purchase of air transportation for sale or resale to other persons without the permission of the third-party credit card holder or carrier; and reporting to the carrier the air transportation cash sale as a credit card transaction where payment was received in cash from the customer for such air transportation. These actions resulted in credit card charge backs in an amount not less than Four Thousand, Three hundred Thirty-Six and 50/00 Dollars ($4,336.50).

66.    DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, JOSEPH RUSSELL, and FRANK J. COSTA either knew or should have known that such credit card usage was taking place, yet took no action to prevent it or otherwise report it to ARC as required by the ARA.

67.    ARC has performed all conditions required of it under the ARA, including all conditions precedent.

68.    As a result of the breaches of the ARA by DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, JOSEPH RUSSELL, and FRANK J. COSTA, ARC has been damaged in an amount not less than One Million, One Hundred Eighteen Thousand, Three Hundred Seventy and 72/00 Dollars ($1,118,370.72), after accounting for all payments and credits.

WHEREFORE, ARC respectfully requests that judgment as to Count One be entered in its favor against DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, JOSEPH RUSSELL, and FRANK J. COSTA jointly and severally for breach of contract and that ARC

Exhibit 3
Page - 28

109927-1

be awarded monetary damages in an amount not less than One Million, One Hundred Eighteen Thousand, Three Hundred Seventy and 72/00 Dollars ($1,118,370.72), plus attorney's fees and costs, and any additional relief that this Court may deem appropriate.

## COUNT TWO: BREACH OF FIDUCIARY DUTY

69.    ARC repeats and realleges the allegations and averments set forth in Paragraphs 1 through 59 of this Complaint as if fully set forth herein.

70.    Under Section XII.D of the ARA, DEFENDANT MARIE A. TAYLOR, as an officer and/or principal of DEFENDANT UNIGLOBE, undertook express fiduciary duties to ARC to hold in trust ARC traffic documents.

71.    Under Section XII.D of the ARA, DEFENDANT THOMAS K. TAYLOR, as an officer and/or principal of DEFENDANT UNIGLOBE, undertook express fiduciary duties to ARC to hold in trust ARC traffic documents.

72.    Under Section XII.D of the ARA, DEFENDANT ROBERT KREMER, as an officer and/or principal of DEFENDANT UNIGLOBE, undertook express fiduciary duties to ARC to hold in trust ARC traffic documents.

73.    Under Section XII.D of the ARA, DEFENDANT MARIO RENDA, as an officer and/or principal of DEFENDANT UNIGLOBE, undertook express fiduciary duties to ARC to hold in trust ARC traffic documents.

74.    Under Section XII.D of the ARA, DEFENDANT JOSEPH RUSSELL, as an officer and/or principal of DEFENDANT UNIGLOBE, undertook express fiduciary duties to ARC to hold in trust ARC traffic documents.

75.    Under Section VII.B of the ARA, DEFENDANT MARIE A. TAYLOR, as an officer and/or principal of DEFENDANT UNIGLOBE, undertook express fiduciary duties to

Exhibit 3
Page - 29

13

109927-1

ARC to hold in trust the proceeds of sales of ARC traffic documents, less applicable commissions, until such proceeds were paid to ARC.

76.    Under Section VII.B of the ARA, DEFENDANT THOMAS K. TAYLOR, as an officer and/or principal of DEFENDANT UNIGLOBE, undertook express fiduciary duties to ARC to hold in trust the proceeds of sales of ARC traffic documents, less applicable commissions, until such proceeds were paid to ARC.

77.    Under Section VII.B of the ARA, DEFENDANT ROBERT KREMER, as an officer and/or principal of DEFENDANT UNIGLOBE, undertook express fiduciary duties to ARC to hold in trust the proceeds of sales of ARC traffic documents, less applicable commissions, until such proceeds were paid to ARC.

78.    Under Section VII.B of the ARA, DEFENDANT MARIO RENDA, as an officer and/or principal of DEFENDANT UNIGLOBE, undertook express fiduciary duties to ARC to hold in trust the proceeds of sales of ARC traffic documents, less applicable commissions, until such proceeds were paid to ARC.

79.    Under Section VII.B of the ARA, DEFENDANT JOSEPH RUSSELL, as an officer and/or principal of DEFENDANT UNIGLOBE, undertook express fiduciary duties to ARC to hold in trust the proceeds of sales of ARC traffic documents, less applicable commissions, until such proceeds were paid to ARC.

80.    Despite the express undertakings of these fiduciary duties set forth in Paragraphs 70-79, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, and JOSEPH RUSSELL deliberately failed to adhere to the terms of the trust, and acted to ARC's detriment, contrary to the terms of the trust.

Exhibit 3
Page - 30

14

109927-1

81.    Additionally, DEFENDANTS THOMAS K. TAYLOR and MARIE A. TAYLOR breached their fiduciary duty by selling and/or transferring ownership, and/or attempting to sell and/or transfer ownership, of the agency without prior approval of Plaintiff ARC, as required by the ARA.

82.    Upon information and belief, in breach of these fiduciary duties and relationships, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, and JOSEPH RUSSELL appropriated for their own use and benefit and/or misdirected and failed to account properly for a sum not less than One Million, One Hundred Eighteen Thousand, Three Hundred Seventy and 72/00 Dollars ($1,118,370.72), which was to be held in trust for ARC's benefit.

83.    Upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, and JOSEPH RUSSELL have acted willfully, wantonly, maliciously, and in reckless disregard of ARC's rights, all to the substantial and intentional detriment of ARC.

84.    DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, and JOSEPH RUSSELL are liable for any and all damages sustained by ARC in this matter.

WHEREFORE, ARC respectfully requests that judgment as to Count Two be entered in its favor jointly and severally against DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, and JOSEPH RUSSELL, and DEFENDANT UNIGLOBE for breach of fiduciary duty and that ARC be awarded monetary damages in an amount not less than One Million, One Hundred Eighteen Thousand, Three Hundred Seventy and 72/00 Dollars ($1,118,370.72), punitive damages in the amount of Five

Exhibit 3
Page - 31

15

109927-1

Hundred Thousand and 00/100 Dollars ($500,000.00), attorney's fees and costs, and any other relief that this Court may deem appropriate.

## COUNT THREE: CONVERSION

85.    ARC repeats and realleges the allegations and averments set forth in Paragraphs 1 through 59 of this Complaint as if fully set forth herein.

86.    Upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA requested or concurred in the request to have ARC forward ARC traffic documents to DEFENDANT UNIGLOBE, ostensibly for use in accordance with the ARA.

87.    Until properly issued to customers of DEFENDANT UNIGLOBE, the ARC traffic documents remain the property of ARC, pursuant to Section XII.D of the ARA.

88.    DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA knew or should have known that the ARA required the submission of weekly sales reports detailing the ARC traffic documents ordered, received, and used by them during the preceding week.

89.    Upon information and belief, despite knowledge of ARC's rights, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA wrongfully applied and converted the ARC traffic documents and the proceeds therefrom to their own use and benefit, depriving ARC of its rights.

Exhibit 3
Page - 32

109927-1

90.     DEFENDANT UNIGLOBE's bank account was established under Section VII of the ARA, for the benefit of ARC.  The account held proceeds of the sale of ARC traffic documents.

91.     Despite demand by ARC, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA have failed and refused, and continue to fail and refuse, to pay ARC for the value of the converted ARC traffic documents, in an amount not less than One Million, One Hundred Eighteen Thousand, Three Hundred Seventy and 72/00 Dollars ($1,118,370.72).

92.     Upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA performed these actions willfully, wantonly, maliciously, and in reckless disregard of ARC's rights, all to the substantial and intentional detriment of ARC.

93.     DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA are liable for any and all damages sustained by ARC in this matter.

WHEREFORE, ARC respectfully requests that judgment as to Count Three be entered in its favor jointly and severally against DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA for conversion and that ARC be awarded monetary damages in an amount not less than One Million, One Hundred Eighteen Thousand,

Exhibit 3
Page - 33

17

109927-1

Three Hundred Seventy and 72/00 Dollars ($1,118,370.72), punitive damages in the amount of Five Hundred Thousand and 00/100 Dollars ($500,000.00), attorney's fees and costs, and any additional relief that this Court may deem appropriate.

### COUNT FOUR: FRAUD

94.    ARC repeats and realleges the allegations and averments set forth in Paragraphs 1 through 59 of this Complaint as if fully set forth herein.

95.    Upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA represented and/or knowingly adopted representations to ARC through the weekly required sales reports that revenues from the issuance of ARC traffic documents had been received in a certain dollar amount when, in fact, the actual dollar amount of sales was far in excess of the amount reported.

96.    Upon information and belief, in each of the weekly required sales reports, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA represented and/or knowingly adopted representations to ARC that they sold airline tickets for cash or by valid credit card transactions, and that they intended to remit the proceeds to ARC through the area bank designated pursuant to Section VII.B of the ARA.

97.    Upon information and belief, despite these representations to ARC, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA (1) did not receive cash or valid credit card charges in exchange for

Exhibit 3
Page - 34

109927-1

those ARC traffic documents completed or issued by them and/or (2) did not remit to ARC the sales proceeds that were received from the ARC traffic documents.

98.    Upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA knew or should have known that these representations to ARC were false when made and that they were made with the intention of deceiving and defrauding ARC and depriving ARC of the sums properly due and owing to it.

99.    ARC had no knowledge of the fraudulent representations made or knowingly adopted by DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA, and relied on the truthfulness of each of the weekly sales reports.

100.    Upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA continued to defraud ARC in the weekly sales reports to ARC's detriment.

101.    ARC relied to its detriment upon all of the misrepresentations either made directly or knowingly adopted by DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA.

102.    As the direct and proximate result of the fraudulent misrepresentations made to ARC by DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT

Exhibit 3

Page - 35

19

109927-1

KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA, ARC has suffered a monetary loss in an amount not less than One Million, One Hundred Eighteen Thousand, Three Hundred Seventy and 72/00 Dollars ($1,118,370.72).

103.    Upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA jointly and severally acted willfully, maliciously, and in knowing disregard of the rights of ARC and are liable for damages.

WHEREFORE, ARC respectfully requests that judgment as to Count Four be entered jointly and severally against DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA, and DEFENDANT UNIGLOBE for fraud and that ARC be awarded monetary damages in an amount not less than One Million, One Hundred Eighteen Thousand, Three Hundred Seventy and 72/00 Dollars ($1,118,370.72), punitive damages in the amount of Five Hundred Thousand and 00/100 Dollars ($500,000.00), attorney's fees and costs, and any additional relief that this Court deems appropriate.

## COUNT FIVE: STATUTORY CONSPIRACY

104.    ARC repeats and realleges the allegations and averments set forth in Paragraphs 1 through 59 as if fully set forth herein.

105.    Upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL,

Exhibit 3
Page - 36

109927-1

FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA intentionally conspired to commit unlawful acts to injure and hinder ARC in its lawful business.

106.    Upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA issued checks drawn on the UNIGLOBE bank account that was established under section VII.B of the ARA for the benefit of ARC.  The monies in the account were proceeds from the sale of ARC traffic documents and were to be held in trust for ARC and the airline carriers.

107.    In addition, upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA purposefully conspired to deprive ARC of other monies due from ticket sales by unlawfully diverting sales proceeds to themselves.

108.    Upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA conspired willfully, maliciously, and knowingly to injure ARC.

109.    As a direct and proximate result of the conspiracy to injure ARC, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA are liable for ARC's monetary loss in an amount not less than One Million, One Hundred Eighteen Thousand, Three Hundred Seventy and 72/00 Dollars ($1,118,370.72).

Exhibit 3
Page - 37

21                                                    109927-1

WHEREFORE, ARC respectfully requests that judgment as to Count Five be entered jointly and severally against DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA, and DEFENDANT UNIGLOBE for conspiracy to injure ARC in violation of Virginia Code §18.2-499, *et seq.,* and that ARC be awarded treble damages in the amount of Three Million, Three Hundred Fifty-Five Thousand, One Hundred Twelve and 16/00 Dollars ($3,355,112.16), attorney's fees and costs, and any additional relief that this Court deems appropriate.

### COUNT SIX: COMMON LAW CONSPIRACY

110.    ARC repeats and realleges the allegations and averments set forth in Paragraphs 1 through 59 of this Complaint as if fully set forth herein.

111.    Upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA acted in concert to defraud ARC.

112.    Upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA combined to accomplish the foregoing unlawful purposes to ARC's detriment.

113.    Upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA actively participated in or acted with reckless disregard for the truth about the scheme whereby the weekly sales

Exhibit 3
Page - 38

109927-1

reports and supporting documentation were prepared so as to deceive ARC and allow continued operations under the ARA.

WHEREFORE, ARC respectfully requests that judgment as to Count Six be entered jointly and severally against DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA, and DEFENDANT UNIGLOBE for common law conspiracy to defraud ARC and that ARC be awarded monetary damages in an amount not less than One Million, One Hundred Eighteen Thousand, Three Hundred Seventy and 72/00 Dollars ($1,118,370.72), punitive damages in an amount of Five Hundred Thousand and 00/100 Dollars ($500,000.00), attorney's fees and costs, and any additional relief that this Court deems appropriate.

### COUNT SEVEN: UNJUST ENRICHMENT

114.    ARC repeats and realleges the allegations and averments set forth in Paragraphs 1 through 59 of this Complaint as if fully set forth herein.

115.    Upon information and belief, DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA possess the proceeds of sales for Dishonored Drafts and Unreported Sales of ARC traffic documents.

116.    DEFENDANT MARIE A. TAYLOR has no legal entitlement to such proceeds in her possession and ought not in justice be allowed to keep the same.

117.    DEFENDANT THOMAS K. TAYLOR has no legal entitlement to such proceeds in his possession and ought not in justice be allowed to keep the same.

Exhibit 3
Page - 39

109927-1

118.   DEFENDANT ROBERT KREMER has no legal entitlement to such proceeds in his possession and ought not in justice be allowed to keep the same.

119.   DEFENDANT MARIO RENDA has no legal entitlement to such proceeds in his possession and ought not in justice be allowed to keep the same.

120.   DEFENDANT JOSEPH RUSSELL has no legal entitlement to such proceeds in his possession and ought not in justice be allowed to keep the same.

121.   DEFENDANT FRANK J. COSTA has no legal entitlement to such proceeds in his possession and ought not in justice be allowed to keep the same.

122.   DEFENDANT JAMES F. KREIDLER has no legal entitlement to such proceeds in his possession and ought not in justice be allowed to keep the same.

123.   DEFENDANT ANTHONY RENDA has no legal entitlement to such proceeds in his possession and ought not in justice be allowed to keep the same.

124.   ARC is legally and equitably entitled to the proceeds from DEFENDANT MARIE A. TAYLOR's disposal of ARC traffic documents.

125.   ARC is legally and equitably entitled to the proceeds from DEFENDANT THOMAS K. TAYLOR's disposal of ARC traffic documents.

126.   ARC is legally and equitably entitled to the proceeds from DEFENDANT ROBERT KREMER's disposal of ARC traffic documents.

127.   ARC is legally and equitably entitled to the proceeds from DEFENDANT MARIO RENDA's disposal of ARC traffic documents.

128.   ARC is legally and equitably entitled to the proceeds from DEFENDANT JOSEPH RUSSELL's disposal of ARC traffic documents.

Exhibit 3
Page - 40

24

109927-1

129.    ARC is legally and equitably entitled to the proceeds from DEFENDANT FRANK J. COSTA's disposal of ARC traffic documents.

130.    ARC is legally and equitably entitled to the proceeds from DEFENDANT JAMES F. KREIDLER's disposal of ARC traffic documents.

131.    ARC is legally and equitably entitled to the proceeds from DEFENDANT ANTHONY RENDA's disposal of ARC traffic documents.

WHEREFORE, ARC respectfully requests the following as to Count Seven: (1) that the Court impose constructive trusts severally on the proceeds of the wrongfully disposed of ARC traffic documents in the possession of each of the several DEFENDANTS MARIE A. TAYLOR, THOMAS K. TAYLOR, ROBERT KREMER, MARIO RENDA, JOSEPH RUSSELL, FRANK J. COSTA, JAMES F. KREIDLER, and ANTHONY RENDA, and DEFENDANT UNIGLOBE, or others for unjust enrichment; (2) that the Court order the Defendants to disgorge the amount each is shown at trial of this matter to have withheld unjustly from ARC; and (3) that the Court award any additional relief that this Court deems appropriate.

Exhibit 3
Page - 41

109927-1

Dated this 30th day of July, 2004.                    AIRLINES REPORTING CORPORATION

By Counsel

BONNER KIERNAN TREBACH & CROCIATA
1250 Eye Street, N.W.
6th Floor
Washington, DC 20005
(202) 712-7000
(202) 712-7100 (facsimile)


By: _____
        Christopher E. Hassell (VSB #30469)
        Felicity A. McGrath (VSB # 41708)
        Suzanne M. Lewis (VSB #39023)
        Counsel for the Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and accurate copies of the foregoing First Amended

Complaint and accompanying Exhibits were served this 30th day of July, 2004, upon the

following via first-class mail, postage-prepaid:

        Thomas K. Taylor
        723 Rivertree Drive
        Oceanside, California  92054

        Marie A. Taylor
        723 Rivertree Drive
        Oceanside, California  92054

        Frank J. Costa
        8723 Stipa Court
        San Diego, California  92129

                    _____
                    Suzanne M. Lewis

Exhibit 3
Page - 42

26

109927-1

Industry Agents' Handbook

## Agent Reporting Agreement

This agreement by and between Airlines Reporting Corporation hereinafter "ARC"), 1530 Wilson Boulevard, Suite 800, Arlington, VA 22209-2448', on its own behalf and on behalf of the carriers which have or hereafter execute the ARC Carrier Services Agreement (hereinafter "carrier" or "carriers") and which appoint the Agent under this agreement,

and

the person who executes the memorandum of agreement, or otherwise concurs in the adoption of this agreement, as described in section XXV hereof, agreeing to be bound to the terms and conditions of this agreement (hereinafter called "the Agent),

### WITNESSETH:

WHEREAS, ARC maintains an agency list containing the names of persons who have been found to meet certain minimum requirements and qualifications, and are eligible to issue ARC traffic documents and to sell air transportation or provide for ancillary services on carriers which appoint them;

WHEREAS, carriers which are parties to the ARC Carrier Services Agreement may appoint and provide their airline-identification plates to such persons for the sale of air transportation and the issuance of ARC traffic documents on their behalf;

WHEREAS, ARC administers and operates the agents' standard ticket and area settlement plan (hereinafter "ASP" or "the Plan") through which persons included on the ARC agency list report ARC traffic documents for the sale of air transportation and ancillary services on behalf of the carriers, and make settlement therefore;

WHEREAS, the Agent engages in the sale of air transportation to the public as agent for and on behalf of the carriers and, upon application duly submitted, the agent has been found qualified for inclusion on the ARC agency list;

WHEREAS, the Agent will utilize the plan to report ARC traffic documents issued for the sales of air transportation and ancillary services on behalf of the carriers appointing such Agent, and make settlement therefore;

NOW, THEREFORE, in consideration of these premises and the mutual covenants and agreements hereinafter set forth, it is mutually agreed as follows:

## Section I:  Purpose and Scope

A. The purpose of this agreement is to facilitate the issuance of ARC traffic documents to the public by agents of carriers in a competitive and efficient manner.

B. This agreement establishes a principal-agent relationship between the Agent and appointing carriers, and governs the terms and conditions under which the Agent is

authorized to issue ARC traffic documents at or through its authorized agency locations in the United States, and does not extend to the terms and conditions under which the Agent is authorized to issue tickets and other forms that the carrier may provide to the Agent.

C. This agreement does not constitute the entire agreement between the Agent and a carrier, but is specifically limited to the terms and conditions contained herein.

D. Certain sections of this agreement are labeled so as to distinguish between those provisions which apply only to authorized locations which submit their sales reports via Interactive Sales Reporting (ISR locations) and those provisions which apply only to authorized locations which submit their sales reports via paper reports (non-ISR locations). In such sections, those provisions preceded directly by the heading "ISR Locations" shall apply only to ISR locations, and those preceded directly by the heading "Postal Locations" shall apply only to non-ISR locations. All other provisions of this agreement, where this distinction is not drawn, shall apply equally to both ISR and non-ISR locations. Because a single "Agent" may have both ISR and non-ISR locations, in such a case both sets of provisions shall apply to this same Agent, the "Postal Location" provisions setting forth the Agent's requirements regarding its non-ISR locations, and the "ISR Location" provisions determining the Agent's obligations for its ISR locations.

## Section II:  Definitions

For the purpose of this agreement

AGENCY LIST and LIST mean the agency list maintained by ARC, which includes the name, address and agency code number for each authorized agency location which has been found qualified under ARC standards, and contains the classification under which the location was included.

AGREEMENT means the ARC Agent Reporting Agreement.

AGENT IDENTIFICATION PLATE means a plate bearing the Agent's name, city, state, and code number, which is used in a validator machine for the validation of ARC traffic documents (paper format).

AIRLINE IDENTIFICATION PLATE means a plate bearing the carrier's name or authorized abbreviation, and code number, and is used in a validator machine for the validation of ARC traffic documents (paper format).

ARBITER means the Travel Agent Arbiter established by ARC as an independent entity (including all Associate Travel Agent Arbiters) to decide disputes between ARC and agents and applicants.



EXHIBIT

1

Page 1

Exhibit 3
Page - 43

ARC LINK means the electronic communications link between ARC and the Agent via the Agent's system provider or via any other means ARC may authorize.

ARC TRAFFIC DOCUMENTS means agents' standard tickets, miscellaneous charges orders, tour orders, and all other accountable forms and documents, both manual and automated, which ARC provides to agents in paper format for issuance to their clients, and which bear ARC-issued numbers, as well as electronic versions thereof. Both formats, paper and electronic, are assumed throughout this agreement; if only one format is applicable, such shall be noted. The term does not include carriers' own ticket stock, which includes tickets, miscellaneous charges orders, tour orders, and other accountable forms and documents of the carriers, or electronic versions thereof.

ARC TRAFFIC DOCUMENTS (PAPER FORMAT) include both manual and automated (transitional automated tickets and Automated Ticket and Boarding Pass forms) ARC traffic documents.

ARC TRAFFIC DOCUMENTS (ELECTRONIC FORMAT) mean any ARC traffic documents other than ARC traffic documents (paper format).

AREA BANK means a bank or a processing center designated to receive and process sales reports and remittances from authorized agency locations.

AUTHORIZED AGENCY LOCATION means a place of business operated by an agent which is included on the agency list, and includes the home office location and any branch office location of the Agent.

CHECK means the check, draft, or debit entry that an area bank draws or initiates on the Agent's account designated pursuant to section VII.B of this agreement, to charge the amount owed by such agent under section VIII hereof. The various terms for describing the charge are used interchangeably in this agreement.

CONTROL means the power or authority to manage, direct, superintend, restrict, regulate, govern, administer, or oversee; and the term embraces every form of control, actual or legal; direct or indirect; negative or affirmative; individual, joint, several, or family, without regard to the type or number of intervening or supervening persons involved. Two persons are under "common control" when both are controlled by the same person or persons.

CREDIT MEMO means any written or electronically transmitted authorization from a carrier to an agent authorizing the deduction by the agent of a specified dollar amount from the agent's sales report.

CREDIT REQUEST MEMO means any written request from an agent to a carrier demanding payment of any obligation arising under the agreement, and includes any form of credit request authorized by the carrier, including the Agent Sales Summary Adjustment Request, Form 1282.

DEBIT MEMO means any written or electronically transmitted request from a carrier to an agent for payment of any obligation arising under this agreement.

ELECTRONIC ISSUANCE of ARC traffic documents must include, but is not limited to, the process by which an ARC-issued number is assigned to the ARC traffic document.

IMPROPERLY REPORTED SALE means the Agent's sale of carrier transportation and/or ancillary services using an ARC traffic document or documents, which, although reported in the Agent's sales report, (a) contains false or inaccurate data (including, but not limited to, false or inaccurate credit card numbers, and/or form of payment); or (b) is unauthorizedly or wrongfully submitted for refund, reissuance, or exchange.

INDUSTRY AGENTS' HANDBOOK or HANDBOOK means a handbook containing various rules, regulations, and instructions of ARC covering an agent's responsibilities and activities under the agreement, which is maintained by ARC, and updated from time to time, and provided to all agents on a current and continuing basis.

INTERACTIVE SALES REPORTING or ISR means an optional, alternative means by which the Agent may submit, for some or all of its authorized agency locations, the sales information required of it hereunder, thereby fulfilling its reporting obligations to ARC and the carriers via electronic submission, rather than exclusively via the submission of paper documents. [NOTE: The term Interactive Sales Reporting (ISR) may be used interchangeably with Interactive Agent Reporting (IAR).]

ISR LOCATION means an authorized agency location which has been approved for participation in ISR, and for which the Agent is required to submit sales reports electronically via ISR.

PERSON includes an individual, corporation, partnership, association, company, or firm.

POSTAL LOCATION means an authorized agency location for which the Agent is required to mail its weekly sales reports on paper, rather than submit them electronically via ISR.

SYSTEM PROVIDER means a person, company, or other legal entity which operates a computerized reservations system which supplies data and/or other products and/or services required for the imprinting of ARC traffic documents in paper format, and/or for the issuance of ARC traffic documents in electronic format, and/or for the submission of data via Interactive Sales Reporting (ISR), by ARC-approved agents, and which has entered into an agreement or agreements with ARC and with the carrier(s) regarding the above described data, products, and/or services.

THE TRAVEL AGENT ARBITER PROGRAM, INC. is a corporation chartered in the District of Columbia whose purpose is to oversee the Travel Agent Arbiter and other specified programs:

Industry Agents' Handbook

REPORTED SALE means the Agent's sale of carrier transportation and/or ancillary services using an ARC traffic document or documents, which sale has not been included by Agent in the sales report as required by this agreement.

UNITED STATES includes only the fifty states and the District of Columbia.

VARIABLE REMITTANCE PLAN means an arrangement negotiated between an individual carrier and an agent, concerning the agent's authorized postal locations, under which an agent settles ARC traffic documents with ARC on a schedule other than the tenth day after the close of the sales period, or settles directly with an individual carrier. There are four variable remittance plan options, including Direct Form of Payment (DP), Direct Form of Payment with Invoice (DI), Variable Payment with Consolidated Check (PC) and Variable Payment with Individual Check (PI).

WEEKLY SALES REPORT or SALES REPORT means the required weekly sales report as described herein, whether in electronic (ISR) format or paper (postal) format.

## Section III: Locations Covered by this Agreement

The Agent may exercise the authority granted herein, only at such places of business operated by the Agent as are included on the ARC agency list.

This agreement covers the home office and all branch locations of the Agent, including any which may be added to the ARC agency list after the date of execution hereof.

No branch location shall be included on the agency list unless the corporate structure or ownership of the home office and the branch is absolute and all inclusive as a single entity, and the home office has full legal and financial responsibility for the administration, staff, liability, maintenance, and operational expense of the branch location.

A. If the Agent wishes to have a place of business included on the agency list as a branch location under the terms of this agreement, it shall submit an application to ARC in accordance with the procedures ARC shall prescribe for submitting and processing such applications. ARC shall not approve any application for a branch location unless, among other things, the Agent is properly bonded in the amount and form required by section IV.A.1 of this agreement.

## Section IV: Qualifications for Retention on the Agency List

To be retained on the agency list, the Agent must continue to meet the following criteria:

A.  Financial Requirements

1.a. The Agent shall, without expense to ARC or any carrier, procure and maintain for the joint and several benefit of the carriers and ARC, a bond issued by a surety included on the current revision of Circular 570 issued by the United States Treasury Department, entitled "Surety Companies Acceptable on Federal Bonds." The bond shall be in the form prescribed from time to time by ARC and shall be in the amount prescribed below. Subject to the minimum and maximum amounts stated below, the amount of the bond shall be equal to at least the average monthly net cash remittance as determined for the twelve-month period ending on the last sales period ending date of the fifth month prior to the anniversary date of the Agent's bond. If the Agent was approved by ARC within the preceding 12 months, the amount of the bond shall be equal to at least the average monthly net cash remittance of the preceding months ending on the last sales period ending date of the fifth month prior to the anniversary date of the Agent's bond.

(1) The minimum amount of the bond that shall be maintained by each Agent approved by ARC for inclusion on its agency list shall be $20,000. This requirement shall remain in force as to each such agent for two years from the date of such approval; thereafter, the minimum shall be $10,000.

(2) In no event shall the amount of the bond required of an applicant for a change of ownership as described in sections I, III, and IV of attachment G of this agreement be less than the amount of the bond required of the Agent prior to the approval of any such ownership change.

(3) The minimum amount of the bond that shall be maintained by each Agent as to which a change of ownership within the scope of section II and section V of attachment G of this agreement is approved by ARC shall be $20,000. This requirement shall remain in force as to each such Agent for two years from the date of such approval; thereafter, the minimum shall be $10,000. However, in no event shall the amount of the bond required of an applicant for any change of ownership as described in sections II and V of attachment G of this agreement be less than the amount of the bond required of the Agent prior to the approval of any such ownership change; or $20,000, whichever is greater.

(4) The maximum amount of the bond that shall be maintained by each Agent shall be $70,000.

b.  In lieu of the bond required by section IV.A.1.a of this agreement, the Agent may provide an irrevocable bank letter of credit in the form prescribed from time to time by ARC. The amount of the letter of credit shall be determined at all times in the same manner as the amount of the bond.

c.  The Agent's bond or letter of credit shall cover all amounts owed by the Agent to the carriers and ARC for tickets or

Page 3.

Exhibit 3
Page - 45

other instruments of value issued on ARC traffic documents which were supplied in trust to the Agent in paper and electronic format, including, but not limited to: amounts owed for tickets and other instruments of value which have been used but not reported or paid for; amounts owed for dishonored drafts or debit entries; and amounts owed on account of the loss, misapplication, theft, forgery, or unlawful use of ARC traffic documents unless the agent is otherwise relieved of liability pursuant to the terms of this agreement.

Effective on and after May 1, 1987, each agent which has been on ARC's agency list continuously for two years, and each agent (1) as to which ARC has approved a change of ownership within the scope of parts II or V of attachment G to this agreement and (2) which has been on ARC's agency list continuously for two years, may maintain, in lieu of the bond or letter of credit prescribed above, a bond or letter of credit in the required form in the amount of $10,000. This option may not be exercised until the Agent has submitted, and ARC has approved in writing, a current financial statement which shall thereafter be updated and submitted annually to ARC for written approval and shall at all times meet the following requirements:

1.  The financial statements of the Agent must: (1) be examined or audited in accordance with generally accepted auditing standards; and (2) be prepared in accordance with generally accepted accounting principles; and (3) contain a report on the examination signed by a person or firm licensed to practice public accountancy in a state of the U.S.  Financial statements which are merely "reviewed" or "compiled," but not examined or audited by a firm licensed to practice public accounting, do not meet these requirements; and

Tangible net assets demonstrated by such statements shall be at least $100,000; and

The report on the financial statements must have been prepared within four months of the close of the period covered by the financial statements and, together with the relevant forms, mailed to ARC within thirty (30) days after the date of the report of the public accountant.

Where the Agent is not a corporation but involves one or more individuals, personal financial statements may be accepted if prepared in accordance with Statement of Position 82-1 as published by the American Institute of Certified Public Accountants, and meets all other requirements set forth above.

Financial statements meeting all the relevant requirements above may be accepted on behalf of an incorporated agent from either the parent organization, if the Agent is its subsidiary, or a stockholder of the Agent, provided that such parent or stockholder has on file with ARC an acceptable

written guarantee of the Agent's obligations under this agreement.

3.  Any required change in form of the bond, or any required adjustment of the amount of the Agent's bond or irrevocable bank letter of credit to provide coverage in excess of the minimum shall be made each time it is renewed, reinstated, or replaced.  If ARC determines that the Agent's bond or irrevocable bank letter of credit is less than the required amount, ARC will notify the Agent at least ninety (90) days in advance of the anniversary date of such instrument.  If, however, the increase required is greater than $10,000, the Agent may increase the bond or letter of credit in the amount of $10,000 per quarter, or 25 percent of the total increase required per quarter, whichever is higher.

Notwithstanding the above concerning the time for adjusting, and the method of adjusting, the amount of coverage required, ARC will not approve an application for an authorized agency location of an agent unless the agent's bond or letter of credit is in the form prescribed by ARC and the amount prescribed by section IV.A.1 of this agreement.

4.  In addition to the other financial requirements of this subsection, the Agent shall cause to have executed on its behalf a "Personal Guaranty of Payment and Performance," attachment C of this agreement, if:

    a.  ARC sends the Agent a notice of financial or reporting irregularity pursuant to section VIII.D.1.a,b, or c;

    b.  The Agent is subject to the additional operating requirements of section IX.B;

    c.  The Agent seeks to appeal ARC's removal of its traffic documents and the airline identification plates pursuant to section XV.A.; or

    d.  The Agent is required by the Arbiter to do so.

B.  Personnel Standards

1.  Each authorized agency location of the Agent shall have at least one person who is a full-time employee of the Agent at the place of business, and is either the owner, partner, officer, manager, or supervisor who fulfills each of the following qualifications:

    a.  Exercises daily supervision of, and responsibility for, the operations of that agency location and has the authority to make management decisions therefor;

    b.  Has at least two years' full-time experience in either (1) selling general travel services to the public or (2) supervising the operation of a business offering such services; and

Exhibit 3
Page - 46

**Industry Agents' Handbook**

Has demonstrated knowledge of the provisions of the *Industry Agents' Handbook*.

ich authorized agency location of the Agent shall have at st one full-time* employee of the Agent who has either:

had, within the past three years, one year's full-time* experience in airline ticketing; or

- Certified ARC Specialist ("CAS") status, having demonstrated knowledge of the provisions of the *Industry Agents' Handbook*, including, for example, Area Settlement Plan ("ASP") processing, ARC traffic document preparation, refunds and exchanges, ticket security rules and procedures, and preparation and reconciliation of weekly sales reports, through successful completion of the Certified ARC Specialist Examination.

l–time" means regularly scheduled working hours at an ency location for a minimum of 35 hours per sales' orting period.

ach authorized agency shall notify ARC in writing of any hange in employment status of any of the Agent's CAS ualifier(s). Such notice shall be sent to ARC within 45 ays of the CAS's change in status.

ICIAL COMMENTARY: Section IV.B.2.b shall be al for all Agents effective January 1, 1998, through nber 31, 1998. The CAS shall be mandatory for all new rs, as well as new branch locations (including on-sites), ype II and V ownership changes, seeking ARC approval after July 1, 1999.]

eneral Qualification Requirements

The Agent shall be a citizen or national of the United States, or an alien authorized employment (see 8 C.F.R. Part 274A), or a foreign corporation authorized to do business in the jurisdiction in which the location is situated.

Each authorized agency location shall be clearly identified as, and held out to the public to be, an office for the sale of air transportation or ancillary services on behalf of the air transportation industry.

The name of the Agent shall not be the same as, or misleadingly similar to, a carrier, and not be identified as an airline office.

Each authorized agency location shall be open and freely accessible to the public.

The office, department, or space which the Agent purports to be the authorized agency location is engaged primarily in the retail sale of passenger transportation.

## D.    Other Requirements

1.    The Agent is ineligible for retention on the agency list where investigation reveals that:

   a.    There was a material misrepresentation or inaccuracy in any application of the Agent for inclusion on the agency list, or for changes to its status or listing thereon, or in any attachments thereto;

   b.    Any person who is involved in the day-to-day operations of the agency and has access to monies from the sale of traffic documents, is not a citizen, or national of the U.S., or an alien authorized employment in the U.S.; or

   c.    The Agent's authorized agency location* does not have the requisite licenses** of the jurisdiction in which located.

   *    For purposes of this section only, authorized agency location is limited to all Independent, Home Office, and Branch locations, including Restricted Access and Special Event locations. Satellite Ticket Printer (STP) and On-Site Branch (OSB) locations are exempt from this requirement, however, unless otherwise mandated by federal, state, or other local law or authority.

   **    Requisite license includes, but is not limited to, any and all licenses mandated by federal, state, or local legislation or authority, which enable the Agent to lawfully conduct business at each of its authorized agency locations. Examples include state licenses, e.g., the California Sellers of Travel Law.

2.    The Agent is ineligible for retention on the agency list if ARC has reason to believe that the Agent, or any person holding a financial or ownership interest in the Agent, or any officer, director, qualifying manager, or any person employed by it in a capacity in which that person has access to ARC traffic documents or money held by the Agent in payment therefor:

   a.    Has or had a financial interest in, or a connection or affiliation with, or was employed by, any agent previously canceled from the agency list*; or

   b.    Has or had a financial interest in, or a connection or affiliation with, or was employed by, any agent presently declared in default under the provisions of section VIII of the agent reporting agreement*; or

   c.    Has been convicted of a felony, or a misdemeanor related to financial activities, or has been found by a court of competent jurisdiction to have committed a breach of fiduciary duty involving the use of funds of others, unless, based upon investigation, experience of the carriers with such person(s), where applicable, and all information and facts available, it is determined by ARC that the Agent can be relied on to adhere to the

Page 5

Exhibit 3
Page - 47

terms of this agreement. If the conduct invoking this provision occurred more than seven years prior to the filing of a complaint with the Arbiter, there shall be a rebuttable presumption the Agent can be relied upon to adhere to the terms of this agreement.

or the purposes of this subsection, references to the ARC gency list and the Agent Reporting Agreement include, in idition, the agency list and the Passenger Sales Agency greement, and its predecessor Sales Agency Agreement, : the Air Traffic Conference of America.

.e applications

.ny applicant agency, including officers, owners, or iareholders thereof which, regardless of intent, fails to isclose, falsifies, or otherwise materially misrepresents .ny application information pertaining to:

)   a previous affiliation with a canceled agency or an agency currently in default;

)   the existence of a felony conviction or financially related misdemeanor;

)   a prior bankruptcy;

)   personal identification;

)   employment history; or

)   the true ownership of the agency,

hall be ineligible for inclusion on the Agency List for a eriod of twelve (12) consecutive months from the date f ARC's disapproval letter advising the applicant such ccurrence has been discovered.

.ny agency or individual may appeal ARC's etermination that it is subject to the terms of this ection to the Travel Agent Arbiter.

## tion V: Appointment of Agent by Carrier

rier may issue an appointment to the Agent permitting the t to issue ARC traffic documents on behalf of the carrier in f two ways:

The Agent shall be automatically appointed by any carrier which has, or hereafter may, deposit with ARC a general concurrence for the appointment of all agents on the ARC agency list. From time to time ARC will publish a list of all carriers which have deposited such a general concurrence.

Any carrier which has not deposited with ARC the general concurrence for the appointment of all agents on the ARC agency list may appoint the Agent by delivering to the Agent a written certificate of appointment.

## Section VI: Change of Name or Location

### A. Procedures To Change Name

The Agent must provide thirty (30) days written advance notice to ARC to change its name and names as set forth in this agreement, under which its activities must be conducted. Within the thirty (30) day period, ARC shall ascertain whether the proposed name violates this agreement. If approved, ARC shall correct the agency list, notify all carriers and the system providers, and, unless the change relates only to a branch location, execute an amendment to the memorandum of agreement reflecting the change. If the proposed change is disapproved, ARC shall notify the carriers and the system providers and also advise the Agent with specific reasons. The Agent may obtain review of that decision by the Arbiter, in accordance with section XXIII of this agreement. Whenever the legal name of the Agent is changed, the Agent must provide to ARC a bond or letter of credit, in the correct amount and form prescribed by ARC, which includes the Agent's new legal name.

### B. Procedures To Change Location

The Agent must provide written advance notice to ARC to change its business location, accompanied by a full description in the form prescribed by ARC. If the new location is qualified under the standards set forth in section IV.C hereof, it shall be approved and ARC shall correct the agency list and notify all carriers and the system providers. If the location fails to qualify, ARC shall disapprove the change and notify the carriers and the system providers, and so advise the Agent with specific reasons. ARC shall advise the Agent of its approval or disapproval within forty-five (45) days of the receipt of the written notice from the Agent. The Agent may obtain review of that decision by the Arbiter, in accordance with section XXIII of this agreement. The Agent may, nevertheless, change the location pending the Arbiter's decision. If the Agent does not request such review and, further, fails to relocate to its former authorized agency location within 30 days from ARC's notice of disapproval, ARC may file a complaint against the Agent.

## Section VII: Agent's Authority, General Rights and Obligations

A.   The Agent shall at all times maintain ethical standards of business in the conduct of the agency and in its dealing with its clients, the public and the carrier.

B.   The Agent shall designate a bank account for the benefit of ARC and the carrier for deposit of (1) the proceeds of the sales of air transportation and ancillary services for which ARC traffic documents were issued, and (2) such funds as may be required to pay any other amount which ARC is authorized to draft from the account. The Agent recognizes that the proceeds of the

Exhibit 3
Page - 48

Industry Agents' Handbook                                              SECTION 80.

es, less the Agent's commissions, on these ARC
ffic documents are the property of the carrier and
ill be held in trust until accounted for to the carrier.

selecting the airline identification plate to be used in
idating ARC traffic documents, or in the identification
the ticketing carrier, the Agent will follow the
ocedures specified in attachment F, hereto.

ie provisions of section VII.C above notwithstanding, no
ent shall use an airline identification plate of one carrier,
identify a carrier on an ARC traffic document as the
keting carrier, in connection with the sale of air
insportation offered solely by another carrier which has
itified the Agent and ARC that the Agent shall not
present that carrier.

exercising its authority under this agreement, the Agent
all issue only ARC traffic documents supplied pursuant
, or authorized by, this agreement.

ne Agent shall deliver to its clients the proper forms of
RC traffic documents and/or supporting documentation
authorized from time to time by the carrier. The
formation shown on any such documents shall be in
ccordance with the applicable rules, regulations and
istructions furnished to the Agent by ARC by specific
istruction or in the Industry Agents' Handbook, and by the
irrier.

he Agent shall comply with all instructions consistent
/ith this agreement properly issued to him by ARC in the
ndustry Agents' Handbook and other specific instructions
onsistent with this agreement provided from time to time
y ARC, including, but not limited to, those instructions
vhich the Agent must follow regarding the electronic
ubmission of its weekly sales reports via ISR.

The Agent shall comply with all instructions of the carrier,
ind shall make no representation not previously authorized
ry the carrier. The Agent shall deliver to the carrier such
ipecific instructions, requests, or particulars in connection
with a client or the transportation as may be proper to
inable the carrier to render efficient service to its
passengers.

The Agent shall not knowingly or negligently sell or issue
ARC traffic documents covering air passenger
transportation to be offered by the carrier to persons who
plan to sell, issue, or offer to sell or issue, such ARC traffic
documents, but who have not been authorized by the
carrier to represent the carrier.

The Agent is not authorized by this agreement to admit,
accept or receive service of summons or any other process
on behalf of the carrier or ARC.

In the absence of specific permission of the carrier, the
Agent shall not use any credit card which is issued in the
name of the Agent, or in the name of any of the Agent's

personnel, or in the name of any third party, for the
purchase of air transportation for sale or resale to other
persons, nor report to the carrier the sale of any air
transportation as a credit card transaction where at any time
the Agent bills, invoices, or receives payment in cash from
the customer for such air transportation."

L.    The Agent shall identify any sales to itself and/or such
other persons which control, are controlled by, or are under
common control with, the Agent, or with the officers,
directors, stockholders, members, or employees of the
Agent and/or such other persons, in accordance with the
provisions of the Industry Agents' Handbook.

## Section VIII: Reports and Settlements, Defaults and Other Financial Irregularities Under ASP

A.    Reports and Settlements–General

1.    The Agent shall make appropriate arrangements to
permit the area bank to draw checks upon its bank
account designated pursuant to section VII.B. of this
agreement in payment for amounts owed hereunder.
The Agent shall give ARC advance notice by certified
mail of its intention to change bank accounts. Such
notice must be received at least 14 days prior to the
beginning of the affected sales period, and will state
the first sales period ending date to which it applies.

## Postal Locations

2.    The Agent shall submit a weekly sales report
containing the auditor's coupon (applicable to both
paper and electronic format) of all ARC traffic
documents, and other supporting documents issued
and validated during the 7-day period Monday
through Sunday. The weekly sales report shall be
submitted to the designated area bank in the form
prescribed. With each report, the Agent shall submit a
settlement authorization form reflecting the maximum
amount to be drawn from the Agent's account. If no
air transportation or ancillary services have been sold
during the 7-day period, the Agent shall submit to the
area bank a weekly sales report reflecting "no sales,"

3.    The weekly sales report, with auditor's coupons and
other supporting documents, or advice of "no sales,"
shall be mailed by First Class mail postage prepaid, or
by Express Mail, or delivered to the designated area
bank, not later than Tuesday following the close of the
report period or by Wednesday if Monday or Tuesday
is a Federal or state legal holiday, Rosh Hashanah or
Yom Kippur.

Page 7

Exhibit 3
Page - 49

## ISR Locations

4.  The Agent shall submit to ARC, in the form prescribed by ARC and via the means set forth in the *Industry Agents' Handbook* or the ISR Training Supplement, a weekly sales report accounting for all ARC traffic documents issued and validated during the 7-day period Monday through Sunday ("sales report period"), and confirming the accuracy of data sent through the system provider by the Agent during this period. With each report, the Agent shall authorize a settlement amount reflecting the maximum amount to be drawn by ARC from the Agent's designated account. If the Agent has sold no air transportation or ancillary services during the 7-day period, the Agent shall submit a sales report reflecting "no sales."

5.  The Agent shall submit the weekly sales report to ARC no later than 11:59 p.m., Eastern Time, on the Tuesday following the close of the report period, or on the Wednesday following the close of the report period if Monday or Tuesday is a Federal or state legal holiday, Rosh Hashanah or Yom Kippur. Only those sales reports received by this deadline shall be considered "timely received."

    The Agent shall obey all ARC and individual carrier rules and instructions concerning the submission and retention of supporting paper documentation, as communicated to the Agent via ARC and/or the carrier.

6.  If the Agent fails to timely submit the weekly sales report to ARC in accordance with the deadline specified above, ARC may provide the data transmitted to ARC via ISR during the sales report period to the carrier(s) to which such data pertains, solely for that carrier(s) information. All sales data submitted electronically to ARC may be reviewed by ARC at any time during or after the sales report period.

7.  Upon receipt of the weekly sales report, ARC shall generate a confirmation number for the report, and transmit this confirmation number to the agency location from which the report was submitted. The number thus generated shall appear on the Agent's ISR computer screen, and the Agent shall (a) print a paper copy of this screen, which shall hereinafter be referred to as the "confirmation screen," or (b) store the information from the confirmation screen within a reliable database from which a paper facsimile of the confirmation screen may be readily generated, or (c) copy the information from the confirmation screen upon a blank "Facsimile Confirmation Screen" form, as found within the *Industry Agents' Handbook* or the ISR Training Supplement. In the event the Agent submits a sales report more than once (e.g., where the

Agent recalls a sales report and resubmits it), the Agent shall (as specified more fully above) print, store, and/or copy the information from each and every confirmation screen generated for the sales report.

## Both Postal and ISR Locations

8.  The area bank will, based upon the sales report submitted by the Agent, determine the amount owed the carriers for the sales period, and will draw a check for such amount on the Agent's account. The check will not be in excess of the settlement authorization amount provided by the Agent, or be presented for payment earlier than the tenth day after the close of the sales period.

    The area bank will mail or otherwise send to the Agent a weekly summary showing all transactions, and the amount of the check drawn, no later than the tenth day after the close of the sales period. Settlement of amounts owing will be made in official United States currency.

9.  All monies and credit card billing documents, less applicable commission, collected by the Agent for sales hereunder are property of the carriers, and shall be held in trust by the Agent until satisfactorily accounted for to the carriers.

## Postal Locations

B.  **Exceptions To Reports and Settlements if Agent Has Ten or More Locations**

    An agent having 1) ten or more authorized locations, or 2) a wholly owned subsidiary with ten or more such locations, or 3) a combination of authorized locations (branch offices) of a wholly owned subsidiary totaling ten or more, may apply for an exception to the provision of section VIII.A.3 above requiring that the sales report and supporting documents be mailed not later than the Tuesday of each week.

    The exception will be granted to any agent having the requisite number of locations, which agrees to process each of its weekly sales reports at its central accounting office and submit them together to one designated area bank. An agent wishing such exception must first execute with ARC a supplementary agreement which, based upon the specific circumstances, authorizes the multi-reporting Agent to cause its weekly reports to be received at the area bank by noon on Thursday or Friday of each week. The exception does not affect the schedule for settlement.

C.  **Other Settlement Arrangements Not Prohibited**

    1.  Nothing contained in this agreement shall preclude an agent from proposing to a carrier which is a party to

Exhibit 3
Page - 50

the Carrier Services Agreement, (a) that, for transactions in which the agent has issued and validated ARC traffic documents, it settle its account pursuant to a variable remittance plan, or (b) that the agent utilize the carrier's traffic documents. If such a proposal is made, the carrier shall consider the agent's proposal in good faith; however, a carrier's refusal to enter into such an arrangement shall not, in and of itself, constitute evidence of bad faith.

An agent shall not, without prior written consent by the carrier concerned, submit a settlement of ARC traffic documents pursuant to a variable remittance plan.

## .nd Postal Locations

### aancial and Reporting Irregularities

This subsection governs payment of amounts due in the event of a dishonored check or failure to file a complete and proper weekly sales report. It does not govern any amounts settled under a variable remittance plan, where applicable, if either the payment is made directly to an individual carrier or ARC collects the amount expressly on behalf of an individual carrier by means of an individual draft. In determining such amounts, debit memos based on the following claims are not to be included: (I) any debit memo issued prior to the date on which the Agent fails or refuses to provide funds on demand to cover a dishonored check, or the amount owed on unreported or improperly reported sales, or a missing report, as required by, respectively, paragraphs D.1.a., D.1.b and D.1.c of this section, which has been reasonably contested by the Agent in writing within 60 days of the Agent's receipt of such debit memo; and (ii) any debit memo issued on or after the date of the Agent's failure or refusal, as described above, for a transaction that occurred more than 60 days prior to such date; provided, however, that any debit memo issued for either an unreported sale, an improperly reported sale, or a fraudulently issued ARC traffic document, shall be includable in determining the amounts due the carriers under this agreement.

a.  ARC will immediately notify the Agent and its surety when a check drawn by the area bank has been dishonored by the Agent's bank. If the Agent does not immediately provide a certified check or wire funds to cover the dishonored check, ARC will (I) withdraw from the Agent, and from all agents under common control with the Agent, and all authorized agency locations under common control with the Agent, all ARC traffic documents (paper format) and airline identification plates, (II) notify the system providers to inhibit the transmission of ticketing records for the printing of such onto ARC traffic

documents (paper format) by such Agent, and (III) prohibit the use of ARC traffic document numbers by system providers for the issuance of ARC traffic documents (electronic format) on behalf of such Agent, and so notify the carriers.

ARC traffic documents will be resupplied and airline identification plates will be returned, except the identification plate of the carrier which has expressly instructed ARC to the contrary, to the Agent and all authorized agency locations under common control with the Agent, and the system providers notified that the issuance of ARC traffic documents is authorized, unless the carrier has also taken action to terminate the Agent's appointment pursuant to section XXIX of this agreement, when all amounts owing the carriers under this agreement have been fully paid (including, but not limited to, all other checks drawn by the area bank and dishonored by the Agent's bank) unless there is an outstanding notice of cancellation of the Agent's bond.

A compensatory assessment shall be charged by ARC for each dishonored check for payment of sales reports to defray processing costs associated with the handling of dishonored checks, interest expense and special service costs described in section XI.H. This assessment will be calculated and charged by ARC based on a formula approved by the ARC Board of Directors. ARC shall notify the Agent as to the amount of the charge and the date on which payment will be due. The Agent hereby authorizes the area bank to collect the charge by issuing a draft against the bank account maintained pursuant to section VII.B of this agreement. Alternatively, the Agent shall make payment directly to ARC if required by the notice.

b.  ARC will notify the Agent if it has failed to include in its weekly sales report all ARC traffic documents issued through the close of the sales report period, as provided in subsections A.2 and A.4 of this section, or has included sales which have been improperly reported. Unless the Agent immediately provides a certified check and supporting documents to cover the unreported and/or improperly reported sales, ARC will notify the carriers, and, where a clear and present danger of substantial loss is present, (I) withdraw from the Agent, and all authorized agency locations under common control with the Agent, all ARC traffic documents (paper format) and airline identification plates, (II) notify the system providers to inhibit the transmission of ticketing records for the printing of such onto ARC traffic documents (paper format) by such

Exhibit 3
Page - 51

Agents, and (iii) prohibit the use of ARC traffic document numbers by system providers for the issuance of ARC traffic documents (electronic format) on behalf of such Agent.

ARC traffic documents will be resupplied and airline identification plates will be returned, except the identification plate of any carrier which has instructed ARC to the contrary, to the Agent and all agents under common control with the Agent, and the system providers notified that the issuance of ARC traffic documents is authorized on behalf of all appointing carriers, unless the carrier has also taken action to terminate the Agent's appointment pursuant to section XXIX of this agreement, when all amounts owing the carriers under this agreement have been satisfactorily accounted for (including, but not limited to, payment of all checks drawn by the area bank and dishonored by the Agent's bank) unless there is an outstanding notice of cancellation of the Agent's bond.

A compensatory assessment shall be charged by ARC for unreported and improperly reported sales disclosed by an inspection pursuant to section XIV of this agreement, or otherwise disclosed, to defray costs associated with the processing and handling of the discovery and resolution of unreported and improperly reported sales, and special service costs described in section XI.H. This assessment will be calculated and charged by ARC based on a formula or formulae approved by the ARC Board of Directors. ARC shall notify the Agent as to the amount of the charge and the date on which payment will be due. The Agent hereby authorizes the area bank to collect the charge by issuing a draft against the bank account maintained pursuant to section VII.B of this agreement. Alternatively, the Agent shall make payment directly to ARC if required by the notice.

## ISR Locations

The Agent will not be liable for a compensatory fee where a malfunction or emergency at (a) ARC, (b) the ARC link, (c) the area bank, or (d) the Agent's system provider, prevents the Agent from reporting sales on time. However, once such malfunction or emergency is corrected, a compensatory fee may be charged where such sales are not reported immediately following the correction of such malfunction.

In order for the Agents to be relieved of a compensatory fee for unreported sales resulting from a malfunction or emergency at the Agent's

system provider, Agent must supply evidence from the system provider that the failure prevented the Agent from timely reporting the sales.

For the purpose of this section, in order to demonstrate that it was "prevented" from reporting sales on time because of a malfunction listed above, the Agent must demonstrate that it was not possible to report its sales timely because of the malfunction.

## Postal Locations

c.   If a weekly sales report together with auditor's coupons and supporting documents has not been received by the area bank within eight days after the close of the period, ARC will notify the Agent.

Evidence of timely dispatch will be limited to:

1)   A Post Office postmark; or

2)   Other evidence supplied by the Post Office of the mailing date; or

3)   Priority service air bill or any other documentation acceptable to ARC.

If the Agent has evidence of timely dispatch of the report, it shall, within 96 hours of notification by ARC, send copies of such evidence to ARC and promptly transmit to the area bank a duplicate report, a settlement authorization form, and facsimiles of the auditor's coupons and other supporting documents for the report. In all other circumstances, the Agent shall, within 96 hours of notification by ARC, provide the report, or a duplicate report, to the area bank with either the auditor's coupons and other supporting documents if available, or their facsimiles, and a certified check to cover the amount owed.

Unless the Agent complies with the above, ARC will (I) withdraw from the Agent, and all authorized agency locations under common control with the Agent, all ARC traffic documents (paper format) and airline identification plates, (II) notify the system providers to inhibit the transmission of ticketing records for the printing of such onto ARC traffic documents (paper format) by such Agent, and (III) prohibit the use of ARC traffic document numbers for the issuance of ARC traffic documents (electronic format) by the system providers on behalf of such Agent, and so notify the carriers.

Page 10

Exhibit 3
Page - 52

ARC traffic documents will be resupplied and airline identification plates will be returned, except the identification plate of any carrier which has expressly instructed ARC to the contrary, to the Agent and authorized agency locations under common control with the Agent, and the system providers notified that the issuance of ARC traffic documents is authorized, unless the carrier has also taken action to terminate the Agent's appointment pursuant to section XXIX of this agreement, when the Agent has provided the report or duplicate report, and paid in full all amounts owed the carriers under this agreement (including, but not limited to, payment of all checks drawn by the area bank and dishonored by the Agent's bank) unless there is an outstanding notice of cancellation of the Agent's bond.

A compensatory assessment shall be charged by ARC for a missing report for which the Agent does not have evidence of timely dispatch to defray handling and processing costs attributable to missing reports and special service costs described in section XLII. This assessment will be calculated and charged by ARC based on a formula approved by the ARC Board of Directors. ARC shall notify the Agent as to the amount of the charge and the date on which payment will be due. The Agent hereby authorizes the area bank to collect the charge by issuing a draft against the bank account maintained pursuant to section VII.B of this agreement. Alternatively, the Agent shall make payment directly to ARC if required by this notice.

## ISR Locations

### (1) WHERE WEEKLY SALES REPORT NOT RECEIVED

If ARC has not received the weekly sales report by 11:59 p.m. Eastern Time on the Tuesday following the close of the report period, or on Wednesday if Monday or Tuesday is a Federal or state legal holiday, Rosh Hashanah or Yom Kippur (hereinafter such time shall be referred to as the "submission deadline"), ARC will notify the Agent.

If the Agent has evidence of timely submission of the report, it shall, within 96 hours of notification by ARC, send copies of such evidence to ARC and resubmit to the area bank the report and settlement authorization. In all other circumstances, the Agent shall, within 96 hours of notification by ARC, submit to ARC the report and a certified check to cover the settlement authorization amount.

For the purpose of this subsection, evidence of timely submission or resubmission of an electronic (ISR) sales report shall be limited to a copy or facsimile of the confirmation screen and number transmitted by ARC to the Agent upon ARC's receipt of the weekly sales report, as described above at paragraph VIII A.7.

[Note: The preceding section applies whenever ARC does not receive the sales report, for any reason. Compensatory fee consequences for different scenarios are addressed below at 5(b).]

### (2) WHERE MALFUNCTION AT ARC RENDERS REPORT UNPROCESSABLE

If the Agent has timely submitted the required sales report, but, because of a malfunction or emergency at the area bank or at ARC, the area bank is unable to process or receive the report, ARC will promptly notify the Agent. Thereafter, the Agent shall, immediately after such notification by ARC, resubmit the report.

### (3) WHERE WEEKLY SALES REPORT RECALLED BY AGENT

The Agent may, at any time before the submission deadline, recall a sales report which it has already submitted, in order to enhance or correct data contained therein. However, the Agent may not recall a previously submitted sales report after the submission deadline for that sales report, and any sales report recalled prior to the submission deadline must be resubmitted by the submission deadline. If a recalled sales report is not resubmitted so that it is received at ARC by the submission deadline, ARC will notify the Agent. Thereafter, the Agent shall, within 96 hours of such notification by ARC, resubmit the report.

### (4) WHERE SYSTEM PROVIDER TERMINATES SERVICE

If the Agent's system provider reporting capability has been disabled because the system provider has terminated service to the Agent, and therefore the Agent is unable to submit electronically its required weekly sales report(s) to ARC, the Agent must fulfill all reporting obligations via paper ("postal location") format, or other mutually agreeable format, whether or not this agreement has terminated. In such an event, the Agent must meet the postal location mailing deadlines as set forth in section VIII, without regard to the time it may take the Agent to convert its electronic records or data to paper.

**(5) CONSEQUENCES OF FAILURE TO TIMELY SUBMIT OR RESUBMIT SALES REPORTS**

a. Revocation of Authority to Issue ARC Traffic Documents.

Unless the Agent submits or, as appropriate, resubmits the report in accordance with the above requirements, ARC will notify the carrier and (I) withdraw from the Agent, and all authorized agency locations under common control with the Agent, all ARC traffic documents (paper format) and airline identification plates, (II) notify the system providers to inhibit the transmission of ticketing records for the printing of such onto ARC traffic documents (paper format) by such Agent, and (III) prohibit the use of ARC traffic document numbers for the issuance of ARC traffic documents (electronic format) by the system providers on behalf of such Agent.

ARC traffic documents will be resupplied and airline identification plates will be returned, except the identification plate of any carrier which has expressly instructed ARC to the contrary, to the Agent and authorized agency locations under common control with the Agent, and the system providers notified that the issuance of ARC traffic documents is authorized, unless the carrier has also taken action to terminate the Agent's appointment pursuant to section XXIX of this agreement, when the Agent has submitted (or resubmitted) the sales report, it has been received at ARC, and the Agent has paid in full all amounts owed to carriers under this agreement (including, but not limited to, payment of all checks drawn by the area bank and dishonored by the Agent's bank) unless there is an outstanding notice of cancellation of the Agent's bond.

For the purposes of this subsection, evidence of timely submission or resubmission of an electronic (ISR) sales report shall be limited to a copy or facsimile of the confirmation screen and number transmitted by ARC to the Agent upon ARC's receipt of the weekly sales report, as described above at paragraph VIII. A.7.

b. Compensatory Fees

In order to defray administrative and other costs attributable to late or missing sales reports and special service costs as described in section XI.H, a compensatory

assessment shall be charged by ARC to the Agent in the following instance:

The sales report is not timely received by ARC, and (whether or not the Agent has supplied the requisite evidence regarding the timeliness of its first submission of the sales report), after notice from ARC, the Agent fails to timely resubmit the sales report, and the Agent has not supplied the requisite evidence of timely resubmission of the sales report, as described below.

Provided, however, that not more than one compensatory fee shall be charged the Agent per any given late or missing sales report.

The assessment will be calculated and charged by ARC based on a formula approved by the ARC Board of Directors. ARC shall notify the Agent as to the amount of the charge and the date on which payment will be due. The Agent hereby authorizes the area bank to collect the charge by issuing a draft against the bank account maintained pursuant to section VII B of the ARA. Alternatively, the Agent shall make payment directly to ARC if required by the notice.

A compensatory fee shall not be charged where a malfunction or emergency at (a) ARC, (b) the ARC link, (c) the area bank, or (d) the Agent's system provider, prevents the Agent from submitting the sales report on time. However, once such malfunction or emergency is corrected, a compensatory fee may be charged where the resubmission of such report is not made within 96 hours of ARC's notice to the Agent that the report has not been timely received.

In order for the Agent to be relieved of a compensatory fee for a missing or late sales report resulting from a malfunction or emergency at the Agent's system provider, the Agent must supply evidence from the system provider that the failure prevented the Agent from timely reporting the sales.

For the purpose of this section, in order to demonstrate that it was "prevented" from reporting sales on time because of a malfunction listed above, the Agent must demonstrate that it was not possible to report its sales timely because of the malfunction.

Exhibit 3
Page - 54

For the purpose of this subsection, evidence of timely submission or resubmission of an electronic (ISR) sales report shall be limited to a copy or facsimile of the confirmation screen and number transmitted by ARC to the Agent upon ARC's receipt of the weekly sales report, as described above at paragraph VIII.A.7.

## ISR and Postal Locations

d. If the Agent is unable to satisfy its debts to ARC arising from circumstances described in paragraphs D.1.a, b, and c of this section within the prescribed time:

  1) The Agent and authorized agency locations and authorized agency locations under common control with the Agent may purchase prepaid special value tickets to be provided by ARC;

  2) In lieu of the Agent and authorized agency locations under common control with the Agent surrendering its ARC traffic documents (paper format) and airline identification plates, the Agent may provide a separate bond to ARC applicable to ARC traffic documents (paper format) remaining in the Agent's possession, the amount of which is based on the average value of ARC traffic documents previously issued by the Agent times the number of documents to be retained. The Agent shall not be eligible to issue ARC traffic documents in electronic format.

e. 1) If the Agent does not provide the required weekly sales reports and full payment therefor, or fails to make full payment of all amounts owed to the carrier (including, but not limited to, payment of all checks drawn by the area bank and dishonored by the agent's bank), on or before the 31st day after the date of ARC's written notice of a default based on a dishonored draft, unreported sale, improperly reported sale, or missing sales report, this agreement shall terminate automatically and without further notice, unless the Agent has surrendered all ARC traffic documents (paper format) and airlines identification plates and has ceased to issue ARC traffic documents in electronic format and, on or before such 31st day, has provided all missing sales reports and made a partial payment in an amount deemed appropriate by ARC, and ARC has determined that the Agent could make full payment if the time were extended, in which case ARC may extend the time for the

Agent to make full payment and avoid termination of this agreement. Upon termination of the agreement pursuant to this section, ARC shall notify the carriers and the system providers that the Agent's agreement has been terminated, and that the issuance of ARC traffic documents is prohibited.

  2) The full amount to be paid within the 31-day period described above or any extension thereof shall include, but not be limited to, all amounts owed for dishonored checks, unreported and improperly reported sales, compensatory fees and missing reports, regardless of whether such amounts and/or reports have been specifically identified in the written notice.

  3) In determining whether or not to extend the time for full payment, ARC will consider the following factors, among others: the cause of the dishonor, unreported or improperly reported sales, or missing report; the payment schedule proposed; the current financial condition of the Agent; and any proposed remedial action.

  4) An extension of time on the terms provided in the foregoing paragraphs shall be available to all agents, regardless of size.

  5) In conjunction with the extension of time provided in the foregoing paragraphs, the Agent may obtain authority from one or more of the carriers involved to convert the Agent's cash indebtedness to each such carrier into individually sponsored credit plans, thereby transferring the indebtedness from ARC to such carrier. Upon receipt of written notice from the carrier concerned, ARC will modify or withdraw the notice of termination, as appropriate.

  6) Upon the Agent's compliance with the foregoing paragraphs, ARC shall resupply the Agent with traffic documents and the carriers may, in their individual discretion, supply or authorize ARC to return to the Agent the airline identification plates. In addition, ARC will notify all system providers that the Agent may issue ARC traffic documents, and the carriers may, in their individual discretion, notify the system providers, if action is to be taken pursuant to section XXIX.

f. Each Agent to whom notice of financial or reporting irregularity is sent pursuant to section VIII.D.1.a, b or c of this agreement shall cause to

be executed and filed with ARC a "National Guaranty of Performance of Agent's Agreement" as set forth in section V, attachment C to the agreement. Such execution and filing shall be a condition precedent to an agent's right to use ARC traffic documents and airline identification plates in the sale of air transportation and/or ancillary services.

This subsection governs insufficient settlement authorization amounts.

a. If the area bank determines that the amount specified by the Agent on the settlement authorization form is less than the amount owed the carriers, the area bank will bill the Agent for the difference. If the area bank bill remains unsatisfied fifteen days after the date on which it was sent, ARC will bill the Agent for the amount owed.

b. If ARC's bill remains unsatisfied for fifteen days after the date on which it was sent, ARC shall take such action as it deems appropriate under the circumstances.

Payment of Carrier Debit Memos

1. If the Agent fails to pay a debit memo sent to it by a carrier or is otherwise in default to a carrier under this agreement, excluding liability for stolen ARC traffic documents or identification plates under section XI hereof, the carrier may:

   a. Terminate its appointment of the Agent, by notice in writing to the Agent, with such notice taking effect on the date specified therein, and withdraw its airline identification plate; or

   b. Withdraw from the Agent its airline identification plate; or

   c. Forward any uncontested debit memo to the Central Collection Service according to the provisions of section XIX of this agreement.

2. If any carrier which has deposited a general concurrence for the appointment of all agents invokes paragraph E.1.a of this section, it may so notify ARC. Upon receipt of such notice, ARC will immediately notify all carriers and the system providers.

Failure To Maintain Proper Bond Or Letter of Credit

1. Upon cancellation of the Agent's bond or irrevocable bank letter of credit, ARC will immediately so notify all carriers and the Agent, and will (I) withdraw all ARC traffic documents (paper format) and airline identification plates supplied to the Agent, (II) notify the system providers to inhibit the transmission of

ticketing records for [ ] printing of such onto ARC traffic documents (paper format) by such Agent, and (III) prohibit the use of ARC traffic document numbers by system providers for the issuance of ARC traffic documents (electronic format) on behalf of such Agent provided, however, that as a temporary measure to avoid these events, the Agent may assign, in a form acceptable to ARC, a Certificate of Deposit in the amount required for a bond pursuant to section IV.A.1.a of this agreement. The effective date and acceptance by ARC of such assignment shall be no later than the date of cancellation of the bond or letter of credit and shall be accepted by ARC as a substitute for a period not to exceed thirty days from the date of the cancellation.

Unless the Agent provides to ARC a proper replacement bond or irrevocable bank letter of credit in the required form and amount, within 30 days after the cancellation, ARC will terminate this agreement. Upon termination of the agreement pursuant to this section, ARC shall notify the carriers and the system providers that the Agent's agreement has been terminated, and that the issuance of ARC traffic documents is prohibited.

2. If ARC determines that the Agent has failed to change the form, or adjust the amount of its bond or letter of credit as required by section IV.A.3 of this agreement, ARC may apply to the Arbiter for an emergency authorization to (I) remove ARC traffic documents (paper format) and the airline identification plates from the Agent, and (II) notify the system providers to inhibit the transmission of ticketing records for the printing of such onto ARC traffic documents (paper format) by such Agent, and (III) prohibit the use of ARC traffic document numbers by system providers for the issuance of ARC traffic documents (electronic format) on behalf of such Agent, and to so notify the carriers.

Section IX:  Additional Operating Requirements

A. The Agent shall be subject to the requirements of this section when, during any twelve month period,

   1. Three or more of the Agent's checks for weekly sales have been dishonored and ARC has not received immediate reimbursement for such upon demand by ARC; or

   2. Three or more of the Agent's weekly sales reports, (whether for its ISR or postal locations) including any and all required auditor's coupons and supporting documents, have not been provided to ARC within 96 hours of notice to the Agent from ARC and such sales reports are ultimately received, prior to the termination date of this agreement pursuant to section VIII.D.1.e.1); or

Exhibit 3
Page - 56

3.   The Agent has been declared in default pursuant to section VIII.D of this agreement (and the default includes a failure or refusal to surrender all ARC traffic documents (paper format) and airline identification plates) but such declaration is withdrawn prior to the Agent's termination.

For the purposes of section IX:

Evidence of timely dispatch of a paper (postal) sales report will be limited to:

1)   A Post Office postmark, or

2)   Other evidence supplied by the Post Office of the mailing date, or

3)   Priority service air bill or any other documentation acceptable to ARC.

Evidence of timely submission or resubmission of an electronic (ISR) sales report shall be limited to a copy or facsimile of the confirmation screen and number transmitted by ARC to the Agent upon ARC's receipt of the weekly sales report, as described above at paragraph VII.A.7.

A late sales report for an ISR location shall not be considered late for the purposes of this section (i.e., count as a "section IX violation") where a malfunction or emergency at (a) ARC, (b) the ARC link, (c) the area bank, or (d) the Agent's system provider, prevents the Agent from timely submitting a sales report. However, once such malfunction or emergency is corrected, the sales report may be considered a section IX violation where the resubmission of such report is not made within 96 hours of ARC's notice to the Agent that the report has not been timely received. In order for the Agent to be relieved of a section IX violation for a missing or late sales report resulting from a malfunction or emergency at the Agent's system provider, the Agent must supply evidence from the system provider that the failure prevented the Agent from timely reporting the sales.

For the purpose of this section, in order to demonstrate that it was "prevented" from reporting sales on time because of a malfunction listed above, the Agent must demonstrate that it was not possible to report its sales timely because of the malfunction.

## ISR and Postal Locations

·   ARC will provide the Agent with 45 days advance written notice of the effectiveness of this section, which notice shall also be provided to the carriers. The notice will also inform the Agent that the following must be accomplished prior to the effective date of the section:

1.   The Agent must provide a bond or letter of credit, in the required form and in an amount equal to or greater

than its net cash remittances for a current 10 week period. The instrument may be a rider to the existing bond or letter of credit; will be calculated to take into account the amount of the existing bond or letter of credit; and, must conform in all other respects to the provisions of section IV.A.

2.   a.   The Agent must surrender traffic documents (paper format) to ARC, with an accompanying inventory summary, so that it retains no more than the highest number of ARC traffic documents issued at each of its locations during any one month in the past twelve months, rounded up to the next (even 100) mailing box or unit. In order to insure the Agent's compliance with this section, ARC will inform the Agent, in the written notice required by this section, of the number of documents, by stock control number, that are permitted to be retained.

   b.   The Agent may possess additional supplies of traffic documents (paper format); but in no event more than a three month supply, only if it is able to post a bond or letter of credit as provided for in section VIII.D.1.d.2).

3.   The Agent must discontinue the issuance of ARC traffic documents in an electronic format and any and all use of Electronic Ticket Delivery Network(s).

4.   Any pending application(s) for an additional approved location will be withdrawn by Agent, and ARC will reject and return to Agent any such application submitted while the Agent is subject to this section.

5.   The Agent must provide a "Personal Guaranty of Payment and Performance" in accordance with section IV.A.4 and attachment C hereto.

C.   If the Agent is not in compliance with the provisions of section IX.B. as of the effective date of this section, or at any time during the period of its effectiveness, ARC will terminate this agreement with the Agent and notify the carriers and the system providers that the Agent's agreement has been terminated and that the issuance of ARC traffic documents is prohibited.

D.   1.   If, following the effectiveness of this section, and Agent's compliance with the provisions of section IX.B., there are no instances of dishonored drafts, missing reports, or defaults within a twelve month period, the additional operating requirements of this section shall be removed, and the carriers shall be notified.

   2.   Alternatively, if there is an additional dishonored draft, missing report, or default, ARC will file a complaint, pursuant to section XV.B., seeking the removal of the Agent from the agency list.

The Agent may appeal ARC's determination that it is subject to this section to the Travel Agent Arbiter. During the pendency of the appeal, which shall be given expedited consideration, this section will continue to apply to the Agent unless or until removed by the Travel Agent Arbiter for the Agent's compliance with section IX.D.1.

## tion X:  Refund or Exchange of ARC Traffic Documents

The Agent may refund any fare or charge applicable to air transportation only if sold by the Agent hereunder and for which the Agent has issued an ARC traffic document. The Agent shall make refund only to the person authorized to receive the refund and in accordance with tariffs, rules, regulations, and instructions issued by the carrier.

The Agent, without the authority of the ticketing carrier whose ARC traffic document is to be issued, shall not:

.. Issue an ARC traffic document in exchange for any traffic document previously issued by another agent or by a carrier; or

2. Issue an ARC traffic document in exchange for a traffic document previously issued by that Agent naming another carrier as the ticketing carrier.

## tion XI:  Liability and Waiver of Claim

The carrier will indemnify and hold harmless the Agent, its officers, agents and employees from all responsibility and liability for any damage, expense, or loss to any person or thing caused by or arising from any negligent act, omission or misrepresentation of the carrier, its representatives, agents, employees, or servants, relating directly or indirectly to the performance of the duties and obligations of the carrier under this agreement.

The Agent will indemnify and hold harmless the carrier, its officers, agents, and employees from all responsibility and liability for any damage, expense, or loss to any person or thing caused by or arising from any negligent act, omission, or misrepresentation of the Agent, its representatives, agents, employees, or servants relating directly or indirectly to the performance of the duties and obligations of the Agent under this agreement.

Unless the Agent is relieved of liability pursuant to this section, the proceeds of the Agent's bond or letter of credit will be applied to, and the Agent will indemnify and hold harmless the carrier, its officers, agents and employees, from any and all damage, expense, or loss, on account of the loss, misapplication, theft, forgery or unlawful use of ARC traffic documents, ARC-issued numbers or other supplies furnished by or on behalf of the carrier to the Agent. The Agent shall be relieved of liability for losses arising from the proven theft or unlawful use, except by the Agent or the Agent's employees, of ARC traffic

documents, ARC-issued numbers or identification plates from the agency premises upon a determination by ARC that the Agent, at the time of theft or unlawful use, exercised reasonable care for the protection of such ARC traffic documents, ARC-issued numbers or airline identification plates, and has, upon discovery, immediately reported the theft or unlawful use to the appropriate law enforcement authorities and has promptly notified ARC of the particulars of such theft or unlawful use both by telephone and telegram.

Reasonable care, as used herein, shall include but not be limited to compliance with the safeguards set forth in attachment B to this agreement.  In making the determination specified herein, ARC may rely on the findings of the ARC Field Investigations and Fraud Prevention office or cooperating security officers of carriers. However, if ARC has filed a complaint with the Arbiter alleging the Agent failed to comply with the safeguards set forth in attachment B of this agreement, ARC shall rely on the finding of the Arbiter in determining whether or not reasonable care was exercised by the Agent. If ARC determines that the Agent did not exercise reasonable care, ARC shall inform the Agent of the specific details and exact manner in which the Agent failed to exercise reasonable care. The Agent may appeal ARC's determination to the Arbiter pursuant to section XXIII.

D.  The Agent hereby expressly waives any and all claims, causes of action, or rights to recovery based upon libel, slander, or defamation of character by reason of publication of asserted grounds or reasons for removal from the agency list or such other action which may have been prescribed, or of alleged violations or other charges for which review of the Agent's eligibility is requested, as is reasonably related to the performance of appropriate functions specified for ARC, its officers and employees, or the Director of Field Investigations and Fraud Prevention or the Arbiter in the performance of their duties under this agreement.

E.  If ARC uses legal counsel to (I) enforce its right to possession of ARC traffic documents (paper format) and airline identification plates, because the Agent failed or refused to surrender them upon demand made pursuant to this agreement, and/or (II) to otherwise obtain compliance by the Agent with the provisions of this section, the Agent shall reimburse ARC for all costs incurred by it, and for the reasonable fees of its attorneys, if its action is adjudicated or otherwise resolved in its favor. If its action is adjudicated or otherwise resolved in favor of the Agent, ARC shall reimburse the Agent for all costs incurred by it, and for the reasonable fees of its attorneys, in defending itself against ARC's action. The term "costs" as used herein shall include, but not be limited to, court costs, litigation bond premiums, private investigator fees incurred in attempting to locate traffic documents, and locksmith fees.

ge 16

Exhibit 3
Page - 58

Industry Agents' Handbook

f ARC uses legal counsel to enforce its right to inspect the Agent's books and records, because the Agent failed or refused to permit an inspection upon demand made pursuant to this agreement, the Agent shall reimburse ARC for all costs incurred by it, and for the reasonable fees of its attorneys, if its demand is adjudicated or otherwise resolved in its favor. If its demand is adjudicated or otherwise resolved in favor of the Agent, ARC shall reimburse the Agent for all costs incurred by it, and for the reasonable fees of its attorneys, in defending itself against ARC's demand. The term "costs" as used herein shall include, but not be limited to, court costs and litigation bond premiums.

The Agent hereby agrees to indemnify and hold the carrier harmless from and against any claim arising from the failure of the Agent to refund to the authorized refund payee the proper amount of fare or other charges collected.

The Agent hereby agrees that whenever an ARC representative must go to an agency or other location to remove ARC traffic documents (paper format only), collect funds due hereunder, etc., the Agent will pay the out-of-pocket special service costs incurred by ARC in conjunction with such action.

## Section XII: Delivery and Withdrawal of Traffic Documents and Identification Plates

The Agent shall procure, at no expense to ARC, one or more validator machine(s), or ticket writer(s), of a type approved by ARC for use at each place of business covered by this agreement in the issuance of ARC traffic documents (paper format).

ARC will supply the Agent with ARC traffic documents (paper format) for issuance to the Agent's clients to cover transportation and ancillary services purchased, and one or more agent identification plates which the Agent will purchase from ARC. Shipping and handling costs on ARC traffic document (paper format) requisitions, submitted by the Agent, will be paid by the Agent as prescribed from time to time by ARC.

After receipt of notice from ARC that an agency location has been included on the agency list, any carrier may deliver to such Agent airline identification plates for use at an authorized agency location in the issuance of ARC traffic documents (paper format) in a validator machine or ticket writer, and such identification plates shall not be used at any other place of business. Such airline identification plates shall remain the property of the carrier, and shall be returned to it upon demand or upon the termination of this agreement as between the Agent and carrier.

All ARC traffic documents (including ARC-issued numbers used in an electronic format), supplied to the Agent shall be held in trust for ARC by the Agent until issued to the Agent's clients to cover transportation or ancillary services purchased, or until otherwise satisfactorily accounted for to ARC or the carrier, and shall be surrendered upon demand, together with all airline identification plates, to ARC pursuant to this agreement.

E. ARC traffic documents (including ARC-issued numbers used in an electronic format) supplied to a specified place of business covered by this agreement shall not be written up or validated at any other place of business. ARC traffic documents (paper format) shall not be delivered to customers at or through any other agency location outside the United States, or customer-premises location.

F. The Agent shall not accept custody of, or deliver, blank, prevalidated, or partially written ARC traffic documents (including ARC-issued numbers used in an electronic format) not previously assigned to it under this agreement. Should the Agent be approached by another agent to distribute blank, prevalidated, or partially written, ARC traffic documents (paper format), or to distribute ARC traffic documents not provided to it through the system provider (electronic format), the Agent shall notify the ARC Director, Field Investigations and Fraud Prevention.

## Section XIII: Custody and Security of Traffic Documents and Identification Plates

During its custody and control of ARC traffic documents, ARC-issued numbers and airline identification plates the Agent shall comply with the security rules for such as specified in attachment B of this agreement.

## Section XIV: Inspection and Retention of Agent Records

### Postal Locations

A. The Agent shall retain a duplicate copy of each sales report and copies of supporting documents, as well as the weekly sales summary and the Agency's copies of voided ARC traffic documents, for at least two years from the date the sales report was due to be submitted to the area bank.

### ISR Locations

The Agent shall retain, in a durable and readily available, accessible and readable medium, either on paper or from which a legible paper copy may be readily produced, for a period of at least two years from the date upon which the sales report was due to be submitted to the area bank, a copy of each weekly sales summary report and a copy or facsimile of each confirmation screen. Further, the Agent shall retain, for at least two years, its original paper copy of

Exhibit 3
Page - 59

(1) all voided traffic documents, (2) all Universal Credit Card Charge Forms (UCCCFs) and (3) all supporting documentation as more expressly stated in the *Industry Agents' Handbook* the ISR Training Supplement, or as otherwise indicated to the Agent by ARC. For these documents (UCCCFs and other supporting documentation), the two year period shall be measured from the ending date of the sales report period during which the transaction evidenced by the documentation occurred.

Specifically regarding agent coupons of ARC traffic documents, the Agent shall also retain, for the amount of time specified in the *Industry Agents' Handbook*, the ISR Training Supplement, or as otherwise indicated to the Agent by ARC, the agent's coupon of all ARC traffic documents issued and validated by it during the period specified in the *Industry Agents' Handbook* or the ISR Training Supplement.

The Agent must send to ARC each week all signed and imprinted UCCCFs for sales of carrier transportation and/or ancillary services as indicated in the *Industry Agents' Handbook*, the ISR Training Supplement, or as otherwise indicated to the Agent by ARC.

[In April 1998, ARC instructed all Agents (both postal and ISR locations) to no longer include Universal Credit Card Charge Forms (UCCCFs) in their weekly sales reports. However, this does not in any way alter or amend the requirement in section XIV for the Agent to retain, for at least two years, its original paper copy of all UCCCFs.]

Upon request by the carrier, the Agent must send (a) any and all supporting documents, as listed above, or (b) information derived therefrom, at the carrier's discretion, to the carrier via the return method specified by the carrier within 5 business days of the date the carrier sent the request. Failure of the Agent to do so may result in the Agent being liable for the transaction to which the documentation relates. If a return delivery method other than fax or U.S. mail is specified by the carrier, the carrier shall bear the cost of such delivery method.

OFFICIAL COMMENTARY: In the ISR environment, travel agents will be required to store supporting documents, including refunded, reissued, and exchanged traffic documents. Because such documents can be used for carrier transportation and ancillary services, it is recommended that travel agents exercise caution in storing, as well as permitting access to, these documents. It is further urged that travel agents clearly mark all such traffic documents as void, to prevent unauthorized use or issuance thereof.]

NOTE A: It is ARC's present intention to establish and maintain a sales data base, and to make this database available to agents for a fee. Agents using this database would no longer be required to maintain transaction records, also

[NOTE B: As of this writing, the particulars of the Agent's responsibilities regarding the retention and submission of credit card charge forms will be in accord with the IAR Charge Form Processing Pilot Program. Pursuant to this program, some carriers may require ISR Agents to submit their charge forms to ARC each week, to be processed by ARC and forwarded to the carrier, while other carriers will not.]

## Both ISR and Postal Locations

B. The Agent recognizes and agrees that ARC and its designees, are authorized to represent ARC and the carriers for purposes of inspecting the books and records of the Agent pursuant to this agreement. In making such inspections, they may seek to determine whether the Agent is in full compliance with the provisions of the agreement. Books and records shall be opened for such inspection upon reasonable notice and the authorized representatives shall have authority to make such notes and copies as they deem appropriate.

C. The Agent will be apprised of the purpose or occasion for such examination, and will be obligated to provide only those documents material and relevant to the examination, that are requested by the authorized representative. ARC shall, upon written request by the Agent, provide a copy of any written report prepared by the ARC representative who has completed an inspection of the books and records of such Agent.

D. A carrier may examine the Agent's records with respect to ARC traffic documents issued by the Agent on behalf of such carrier at any time.

## Section XV: Reviews of Qualifications of and Breaches by Agent

A. In situations such as the following, in which it appears to ARC that there may be or has been fraudulent conduct on the part of the Agent and that there is a clear and present danger of substantial loss to ARC and/or the carriers, ARC may (I) immediately remove its traffic documents (paper format only) and all airline identification plates from the Agent, and so notify the carriers, (II) notify the system providers to inhibit the transmission of ticketing records for the printing of such onto ARC traffic documents (paper format) by such Agent, and (III) prohibit the use of ARC traffic document numbers for the issuance of ARC traffic documents (electronic format) by system providers on behalf of such Agent and all agents under common control with the Agent:

1. Failure to include in a report the auditor's coupon (paper or electronic format) of all ARC traffic documents issued through the close of the sales report period, even though payment was subsequently made upon demand;

Exhibit 3
Page - 60

Issuance of ARC traffic documents against a credit card without the cardholder's authority, or against a stolen or otherwise fraudulent credit card;

Post-validation of ARC traffic documents; alteration of the issuance date on ARC traffic documents; or consistent or extensive reporting of sales in which ARC traffic documents have been issued out of numerical sequence;

Failure to account for missing ARC traffic documents or for flight, exchange, or service coupons thereof;

i. Permitting blank, prevalidated, or partially written ARC traffic documents (paper format), or ARC-issued numbers (electronic format) to be removed from the authorized agency location for issuance elsewhere;

5. Permitting alteration, omission, or other falsification on coupons of original ARC traffic documents or on any reissue thereof;

7. Falsification of reports, traffic documents, or other documents;

8. Acceptance of custody of, or delivering, blank, prevalidated, or partially written ARC traffic documents (paper format) or ARC-issued numbers (electronic format) not previously assigned to it under this agreement;

9. Distribution, sale or issuance of ARC traffic documents (paper format) or ARC-issued numbers (electronic format) which the Agent knew, or reasonably should have known, were stolen or reported as missing; or

10. Reporting cash refunds against sales made on credit cards.

11. Permitting the unlawful or unauthorized access or use of an airline or system provider computer reservations system owned, leased or controlled by it in connection with the issuance of ARC traffic documents.

12. Without the authority of the ticketing carrier on which the ARC traffic document is issued, (a) issuing an ARC traffic document in exchange for any traffic document previously issued by another agent or by a carrier, or (b) issuing an ARC traffic document in exchange for a traffic document previously issued by the Agent naming another carrier as the ticketing carrier;

13. Engaging in a pattern of potential "bust-out" activity, such as a sudden, sharp increase of sales, which, along with other relevant information, indicates to ARC that the Agent is engaging in fraud;

14. Issuing, writing up, or otherwise producing duplicate or invalid credit memos;

15. In the absence of specific permission of the carrier, using any credit card which is issued in the name of the Agent, or in the name of any of the Agent's personnel, or in the name of any third party, for the purchase of air transportation for sale or resale to other persons, or reporting to the carrier the sale of any air transportation as a credit card transaction where at any time the Agent bills, invoices, or receives payment in cash from the customer for such air transportation; or

16. Submitting for refund or reissuance an ARC traffic document or transaction which has already been refunded or reissued.

The Agent shall thereupon have the right of appeal to the Arbiter on an expedited basis pursuant to procedures established by the Arbiter. Unless, within 10 calendar days after ARC's demand for ARC's traffic documents and the airline identification plates, (a) an appeal is received by the Arbiter, (b) ARC has received from the Agent all ARC traffic documents (paper format) and airline identification plates entrusted to the Agent, and (c) ARC has received from the Agent a properly executed "Personal Guaranty of Payment and Performance," attachment C of this agreement, the Agent's agreement will be terminated by ARC without further notice. Upon termination of the agreement pursuant to this section, ARC shall notify the carriers and the system providers that the Agreement has been terminated and that the issuance of ARC traffic documents is prohibited.

B. If there is reason to believe that the Agent has breached a provision of this agreement, ARC may file a complaint against the Agent with the Arbiter.

C. If the Arbiter so directs, ARC shall remove from the agency list the Agent or any branch location. After the Agent has been removed from the agency list, ARC shall terminate the agreement with the Agent on behalf of all carriers. Upon termination of the agreement pursuant to this section, ARC shall notify the carriers and the system providers that the agreement has been terminated and that the issuance of ARC traffic documents is prohibited.

## Section XVI: Annual and Application Fees

A. For each calendar year the Agent agrees to pay an annual administrative fee to ARC for each of its authorized agency locations to defray a portion of the costs associated with the operation of the ARC program as well as half of the costs associated with the operation of the Travel Agent Arbiter Program, Inc. The amount of such annual fee will be determined by the ARC Board of Directors, and ARC will notify the Agent of the amount of the fee for the next ensuing year before the end of the previous calendar year.

This fee will be collected by an area bank which will draw a separate check against the designated account of each authorized agency location with the second sales report period ending in January for the current calendar year.

If the separate check for the annual fee is not paid, and the amount remains unpaid 14 days thereafter, the Agent or authorized agency location involved will be removed from the agency list. Thereafter, ARC shall terminate the agreement and withdraw from the Agent all ARC traffic documents and airline identification plates and so notify the carriers. ARC shall also notify the carriers and the system providers that the agreement has been terminated and that the issuance of ARC traffic documents is prohibited.

For an authorized agency location added to the agency list during a calendar year, the annual fee will be included with the application fee.

An application filed by the Agent under this agreement to change its name, location, or ownership shall include herewith a fee as prescribed from time to time by ARC. The amount of such fee shall relate to the administrative expenses in processing the application and expenses incurred in updating the database.

## ction XVII: Special Location Exemptions

An agency location may, upon request by the Agent, be classified as an on-site location if it meets the following conditions:

1. The location is on the premises of a single client of the Agent for the primary purpose of providing travel services to that client. It is not intended to serve the general public;

icial Commentary: It is ARC's intent that the Agent arily serve one client's business needs at this location (for aple, one corporate client or one government client), but not recluded from providing that client's employees with leisure al counseling and ticketing or from serving other business rts.]

2. The location complies with all requirements for a branch application, except as otherwise noted, although it need not comply with section IV.B.1, section IV.C.5, or section VI.C, X.C.1, or X.A. of Attachment B; and

FICIAL COMMENTARY: ARC recognizes that an on-site ction is not engaged in the sale of air transportation to the eral public. ARC also envisions that a cubicle may be the ial on-site location; and recognizes that such a location not be locked. Hence, the exceptions from section IV.C.5 from section X.A of attachment B are provided for. The

other exceptions, however, if utilized by the Agent, carry with them the assumption of full and absolute liability for any and all damage, expense or loss at such locations. See, also, section XVII.D.6 below.]

3. The location is or will be staffed by a person meeting the personnel standards of section IV.B.2 (but that person may be employed by either the Agent or the client of the Agent);

4. The location is not identified or advertised to the public as, or held out to the public to be, an office for the sale of air transportation or ancillary services on behalf of the air transportation industry. However, signage, identifying the on-site branch location within the premises occupied by the Agent's client, is permitted;

5. If the location is not in compliance with section VI.C of attachment B, then the traffic documents referenced in sections VI.A.2 and A.3 of Attachment B must be placed in a locked steel container.

6. If the location is staffed by a person employed by the client of the Agent or if the location does not fully comply with section VI.C or X.C.1 of attachment B, then the Agent assumes full and absolute liability for any and all damage, expense, or loss experienced by any carrier, its officers, agents, or employees on account of the loss, misapplication, theft, or forgery of ARC traffic documents assigned to the location.

[OFFICIAL COMMENTARY: The Agent will, conversely, be relieved from liability if the security container detailed in section VI.C and the ticket printer referenced in section X.C.1 are placed in a locked room under its exclusive control, and the ticketing qualifier at the location is employed by the Agent.]

B. An authorized agency location that is not open and freely accessible to the public may, upon request by the Agent, be classified as a restricted-access location. A restricted-access location must meet all the requirements provided in this agreement, including the qualifications in section IV for retention on the agency list, except for the requirements provided in sections IV.C.2, 4, and 5.

C. 1. An Agent who wishes to have an authorized agency location classified as a customer-premise or restricted-access location, or who wishes to have an existing classification terminated, shall submit to ARC a written request for such action. If the request is to obtain a new classification, it shall set forth facts sufficient to show that the location is entitled to the classification requested in accordance with the qualifications set forth in subsection A or B above. If this request is to terminate an existing classification, it shall set forth facts sufficient to show that the location

Exhibit 3
Page - 62

meets the qualifications in section IV for retention on the agency list from which the location was exempted by virtue of its current classification.

ARC shall promptly review any such request and notify the Agent whether the request is granted or denied. If the request is denied, the notification to the Agent shall include a statement of the reasons therefor. The Agent may obtain review of the denial, in accordance with section XXIII of this agreement.

on written request to ARC by the Agent, an agency cation may be classified as an Electronic Office if it eets all of the following conditions:

The location is accredited as an independent entity, home office, branch, restricted-access location, or on-site location;

The location issues ARC traffic documents in electronic format only (i.e., e-tickets); reports e-ticket sales via IAR; and validates the e-tickets in accordance with this agreement.

Except as otherwise noted, an electronic office must meet all the requirements provided in this agreement, including the requirements in section IV for retention on the agency list;

4.  The location is not located on the premises of and does not function as a Ticketing Fulfillment (TF) Location;

[Official Commentary: A Ticketing Fulfillment ("TF") Location is a branch office location – and may not be a Satellite Ticket Printer ("STP") location or Ticket Delivery Machine ("TDM") location – whose purpose is to serve as a centralized ticket printing office for the Agent. No sales activity, such as, but not limited to, travel promotion, counseling and reservations, shall occur at this location.]

5.  The location does not function as a ticket shipping location for any other branch or Satellite Ticket Printer (STP).

6.  The location is or will be staffed by a person meeting the personnel standards of section IV.B.2;

7.  The reservations equipment at the location does not have ticketing system functionality.

8.  The location shall not order, issue or store accountable ARC traffic documents or airline identification plates. The location need not comply with Part A of Attachment B, but the location must comply with Part B of Attachment B and any other applicable security requirements.

on written approval of the request, the agency location all be classified as an Electronic Office.

## Section XVIII: Notices 

A.  Any notice which this agreement explicitly requires to be given in writing shall be sufficient if sent by prepaid telegram, mailgram, mail, or any government licensed delivery service which service provides a shipping receipt, airbill, or documentation of delivery, addressed as the Agent or ARC (as appropriate) shall have designated in writing during the term of this agreement.

The date of such notice, for the purpose of making calculations with regard thereto, shall be the date such notice was mailed, telegraphed, or placed in the hand of a government licensed delivery service for delivery.

B.  Any notice which this agreement does not explicitly require to be made in writing shall be sufficient if made by any reasonable means, including, but not limited to, telephone notice or, for ISR locations, a screen prompt over the Agent's system provider.

## Section XIX: Central Collection Service

In order to expedite the flow and payment of (1) debit memos issued by a carrier against the Agent, and (2) credit request memos issued by the Agent against a carrier, and to provide a uniform manner of processing such items should the Agent or carrier fail to act upon direct submissions to them within a reasonable time, the Agent and carriers may issue credit request memos and debit memos, respectively, which may be submitted to the Central Collection Service, under the terms and conditions set forth in attachment D, hereto.

## Section XX: Transfer or Assignment of Agreement, Deaths Affecting Owner-ship, Abandonment of Authorized Agency Location, Temporary Closure

A.  Change of Ownership

1.  This agreement may not be assigned or transferred by the Agent without the approval of ARC. Moreover, if 30 percent or more of the shares of stock, cumulative, of the Agent have been sold or otherwise transferred (unless such Agent is an entity whose shares are listed on a securities exchange or are regularly traded in an over-the-counter market), ARC approval, for purposes of retention on the ARC agency list, must be obtained.

2.  Procedures for approval of changes of ownership are set forth in attachment G hereof. Upon receipt of a complete application for approval of a change of ownership, ARC shall notify the carriers and the system providers. Carriers and system providers will also be notified when such application is approved.

3.  Possession of ARC traffic documents (paper format) by a new owner as well as access to such in an electronic format prior to ARC approval will be subject to appropriate action by ARC.

Page 21

Exhibit 3
Page - 63

If ARC determines that this agreement has been assigned or transferred, or that ownership of a branch location covered by this agreement has been assigned or transferred or that 30 percent or more of the stock in the agency entity has been sold or otherwise transferred and that ARC approval for purposes of retention on the ARC agency list has not been given, ARC may take appropriate action consistent with section XXIII of this agreement.

In the event a transfer or assignment of ownership interest occurs without ARC approval with respect to a branch location, the procedures set forth in paragraph 4 above shall only apply to the agency location affected by the change.

:approval of Change of Ownership

disapproves an application for a change of ownership, riers and the system providers shall be notified. The nt may obtain a review of the disapproval by the Arbiter, dance with section XXIII of this agreement.

riers and system providers shall also be notified when an ion for approval of change of ownership is withdrawn . eturned to the applicant.

ath of a Sole Proprietor

On receipt of information of the death of the sole proprietor of the Agent, ARC shall notify all carriers, and may (I) withdraw all ARC traffic documents (paper format) and airline identification plates supplied to such Agent, and (II) notify the system providers to inhibit the transmission of ticketing records for the printing of such onto ARC traffic documents (paper format) by such Agent, and (III) prohibit the use of ARC traffic document numbers by system providers for the issuance of ARC traffic documents (electronic format) on behalf of such Agent. In order to preserve the goodwill of the agency as far as possible, ARC may, at the request of the person entitled to represent the deceased's estate, enter into a temporary agreement with such person acting on behalf of the estate provided that such person submits a proper bond or letter of credit in the name of the estate. The temporary agreement shall be in the same form and have the same effect as this agreement. ARC shall examine the matter periodically, and, if it considers that conditions so warrant, shall direct that the temporary agreement be terminated. ARC shall notify all carriers and the agency accordingly, and may take appropriate action consistent with section XXIII of this agreement. Upon termination of the temporary agreement, ARC shall so notify the carriers and the system providers that the issuance of ARC traffic documents, whether in paper or electronic format, is prohibited.

2. If the person entitled to represent the estate proposes to transfer the temporary agreement to an heir, legatee, or other person, such transfer shall be deemed a change of ownership, and the procedures of attachment G shall apply.

3. Subject to earlier termination under the provision set forth above, a temporary agreement shall terminate if the representative of the estate ceases to carry on the agency business at the location covered by such agreement.

D.  Death of a Partner

1. In the event of a death of a member of a partnership or other unincorporated firm, ARC will notify all carriers, and may (I) withdraw all ARC traffic documents (paper format) and airline identification plates supplied to such Agent and (II) notify the system providers to inhibit the transmission of ticketing records for the printing of such onto ARC traffic documents (paper format) by such Agent, and (III) prohibit the use of ARC traffic document numbers by system providers for the issuance of ARC traffic documents (electronic format) on behalf of such Agent. In order to preserve the goodwill of the agency as much as possible, ARC may enter into a temporary agreement with the representative of the deceased's estate and/or remaining partner(s), provided such person(s) presents a proper bond or letter of credit as provided herein. The temporary agreement may be extended by ARC for good cause shown. The temporary agreement shall be in the same form and have the same terms and conditions as this agreement.

2. If the person(s) with whom the temporary agreement is executed proposes to become the new owner(s), or proposes to transfer the agreement to another person, such transfer shall be deemed a change of ownership and the procedures of attachment G shall apply.

3. Subject to earlier termination under the provision set forth above, a temporary agreement shall terminate if the person(s) with whom the temporary agreement is executed ceases to carry on the agency business at the location covered by such agreement.

E.  Abandonment of Authorized Agency Location

1. If ARC has cause to believe that the Agent has failed to keep its authorized agency location open and freely accessible to the public in accordance with section IV.C.4 (except as provided in section XVII of this agreement) and/or the Agent has moved its agency location without prior written notice to ARC (in accordance with section VLB of this agreement), ARC will notify the agent in writing of such breach or breaches. Such notice shall be sent to the address which the Agent shall have designated in writing

22

Exhibit 3
Page - 64

during the term of this Agreement, by a delivery service which provides a shipping receipt, airbill, or documentation of delivery. If ARC does not receive a written response to such notice on or before the 15th day from the date of such notice, this agreement shall terminate automatically and without further notice, effective the 16th day from the date of such notice. ARC shall notify the carriers and the system providers that the Agreement has been terminated and that the issuance of ARC traffic documents is prohibited.

a) ARC shall have cause to believe that the Agent has closed, abandoned, or changed its authorized agency location without notifying ARC, for the purposes of this section, based on any reliable indicia of abandonment, closure, or changed location, including, but not limited to, the following: (1) the disconnection of the telephone number of the Agent's authorized location with no indication that the number has been changed or the telephone line has been damaged or is being serviced; (2) an ARC representative's observations upon visiting the Agent's authorized location, e.g., location is empty or non-existent, no forwarding address; or, (3) two or more returned letters or written notices sent by ARC to Agent's address of record.

**Temporary Closure**

1. In the event of a situation beyond the Agent's control, e.g., fire, flood, illness, ARC may, upon written request by the Agent, permit the Agent to temporarily close its authorized agency location(s), for a period not to exceed 30 days. The Agent's request must be made within 10 days of the closure of the agency location. If circumstances warrant, ARC may approve a request for temporary closure which exceeds 30 days. All requests for temporary closure must be in the form prescribed by ARC and approved by ARC in writing. ARC's approval shall state the temporary closure time period. ARC shall not unreasonably deny any request for temporary closure of an authorized agency location, and the Agent may request the Travel Agent Arbiter to review any such denial.

2. The Agent's bond or letter of credit shall remain in full force and effect. Agent shall, in accordance with section VIII of this agreement, continue to submit weekly sales reports reflecting "no sales" when the agency location is temporarily closed unless ARC has removed all ARC traffic documents and carrier identification plates from the Agent during the period of closure, and notified the carriers and system providers that issuance of ARC traffic documents is prohibited.

3. ARC shall notify the carriers and the system providers of the temporary closure of the Agent's authorized

location(s), directing that the system providers inhibit the transmission of ticketing records for the printing of such onto ARC traffic documents (paper format) by such Agents, and prohibiting the use of ARC traffic document numbers by system providers for the issuance of ARC traffic documents (electronic format) on behalf of such Agent. When the location(s) are reopened, the carriers and the system providers shall be notified.

4. If the agent fails to reopen within the time period approved by ARC, the agreement with the closed location(s) will be terminated, following 18 days advance notice to the Agent, and ARC shall notify the carriers and the system providers, accordingly.

## Section XXI:  Reduced Rate Transportation for Agent

The provision of free or reduced rate transportation by a carrier to the Agent and its employees shall be in accordance with such terms, rules and regulations as the carrier shall establish.

## Section XXII:  Remuneration of Agents

The remuneration paid the Agent for the sale of air transportation shall be that established by the carrier, or shall be such as may be mutually agreed between the carrier and the Agent, and is not provided herein.

## Section XXIII:  Travel Agent Arbiter

Disputes between the Agent and ARC shall be resolved by the Arbiter in accordance with the rules and procedures promulgated and published by the Arbiter and the decision of the Arbiter shall be final and binding; provided, however, that neither the Agent nor ARC is precluded from seeking judicial relief to enforce a decision of the Arbiter, or to compel compliance with a requirement or prohibition of this agreement prior to the filing of an answer in a proceeding concerning such requirement or prohibition before the Arbiter.

## Section XXIV:  Interpretive Opinion Procedures

A. The Agent may, by written submission, request from ARC an opinion of the interpretation or application of an ARC resolution or a provision of an ARC agreement which may affect travel agents in their role as agents for carrier parties to the ARC carrier-services agreement.  The following guidelines will apply to such a request:

1. ARC must answer the request within fifteen (15) days of its receipt;

2. The opinion shall relate only to the Agent and the specific question(s) raised in the request; and

Unless the Agent seeks appeal of the opinion as hereinafter provided, the request and opinion shall not be circulated to any other person.

e Agent seeking appeal of an opinion rendered above ly by written submission to ARC, place on the agenda of : next ARC Board of Directors meeting, a request for the :iew of the opinion. The Board's decision shall be ported in the Minutes of the meeting, and a copy of the cision shall be promptly provided to the Agent.

## ion XXV: Memorandum of Agreement nd Alternative Means of Agent concurrence

nay prepare a memorandum of agreement, execution of binds ARC and the Agent, and the carriers appointing the to the terms and conditions of this agreement. The andum of agreement shall be executed in duplicate. The s copy shall be attached to its copy of this agreement and :ond copy will be returned to, and retained by, ARC. atively, the Agent's concurrence in the terms and ions of this agreement may be obtained through an mic signature; may be deemed to have occurred upon the s performance under the agreement, following advance , as of a fixed date; or, may be obtained or deemed to ccurred by any other means adopted by the ARC Board ectors, such as via the entry of an electronic personal ication number (PIN), which means is performed by the after such adoption.

## tion XXVI: Amendment of this Agreement

RC, in discharging the responsibility of notice, will ubmit each future amendment to this agreement to the gent not less than forty-five days prior to the effective ate of the amendment, unless otherwise specified. n the event that, immediately prior to the effectiveness of he amendment, this agreement is at that time subject to ermination in accordance with its terms, this agreement hall remain subject to such termination, without regard to vhether the amendment alters any provision of this igreement related to the basis for the termination.

f ARC does not receive an executed amendment by the :ffective date thereof or the Agent's concurrence in the Agreement cannot be demonstrated, ARC may remove the Agent from the agency list and terminate this agreement vith the Agent. Thereupon, ARC shall notify the carriers and, also, the system providers that the issuance of ARC raffic documents is prohibited.

## tion XXVII: Assurance of Nondiscrimination ation (Effective only as between the Agent and each U.S. carrier; not effective as between the Agent and ARC, itself).

e 24

In accordance with the Air Carr... ess Act of 1986 and 14 C.F.R. Part 382, the Agent shall not discriminate on the basis of handicap in performing services for air carriers subject to said Act, and the Agent shall comply with directives of the air carrier Complaints Resolution Officials issued pursuant to 14 C.F.R. Part 383.

## Section XXVIII: Effectiveness

A. This agreement shall become effective as between the Agent and ARC on the date stated on the memorandum of agreement.

B. This agreement shall be effective as between the Agent and each carrier which has, or hereafter may have, issued an appointment to the Agent. This agreement shall have the same force and effect between the carrier and the Agent as though they were both named in, and had subscribed their names to, the memorandum on the date appearing thereon.

## Section XXIX: Termination

A. This agreement may be terminated as between the Agent and ARC, and between the Agent and all carriers jointly, at any time by notice from the Agent to ARC, subject to a full and complete accounting. This agreement may be terminated as between ARC and the Agent in accordance with this agreement by notice in writing from ARC to the Agent.

B. Whenever under the terms of this agreement ARC is required to remove the Agent or its branch location from the agency list, ARC will terminate this agreement with respect to the Agent or location, respectively.

C. Upon termination as between the Agent and ARC, and between the Agent and all carriers jointly, all unused ARC traffic documents (paper format) and airline identification plates shall be immediately returned, together with all monies due and payable to the carriers hereunder, and a complete and satisfactory accounting rendered. ARC may designate a representative to remove all ARC traffic documents (paper format) and airline identification plates from the Agent.

## ISR locations

In addition to the above, upon termination as between the Agent and ARC, and between the Agent and all carriers jointly, the Agent must return to ARC all supporting documents as listed in section XIV, above, which are less than or equal to two years of age as of the date of termination, such age to be calculated from the ending date of the report period during which the transaction evidenced by the supporting documents occurred. ARC may designate a representative to remove all ARC traffic documents (paper format) and airline identification plates from the Agent.

Exhibit 3
Page - 66

Industry Agents' Handbook

## and Postal Locations

Whenever this agreement is terminated pursuant to paragraph A or B above, ARC shall notify all carriers and advise them of the effective date thereof. ARC shall also notify the system providers that the issuance of ARC traffic documents, whether in paper or electronic format, is prohibited. Additionally, the Agent shall cease any and all use of its code number(s) for purposes related to the issuance of ARC traffic documents.

A carrier appointment may be terminated as between the Agent and any individual carrier at any time by notice in writing from one to the other. If a carrier which issues specific certificates of appointment under section V hereof, elects to terminate its appointment of the Agent, it shall notify the Agent of the termination of the certificate of appointment. A carrier which has deposited with ARC a concurrence for appointment of all agents may terminate its appointment of the Agent by notifying the Agent by prepaid telegram, mailgram, mail, or any government licensed delivery service which service provides a shipping receipt, air bill or documentation of delivery (e.g., an overnight delivery service such as Airborne Express, Federal Express, UPS, etc.), with a copy to ARC's Accreditation and Database Management department, such notice to be distributed by ARC to all carrier participants, that the Agent shall not represent that carrier. ARC shall also notify the system providers that the Agent's agreement with the carrier is terminated. The system providers shall inhibit the printing of ARC traffic documents validated with such carrier's identifier as well the generation of such ARC traffic documents in an electronic format. Upon receipt of notice from a carrier that the termination of the Agent's agreement has been rescinded or revoked, ARC shall so notify the carriers and the system providers.

F. Termination shall take effect immediately upon receipt of notice, or upon the date indicated therein, whichever shall be later, subject to the fulfillment by each of the parties of all obligations accrued prior to the effective date of such termination.

G. ARC shall be considered a real party in interest in any cause of action, suit, or arbitration (hereinafter collectively "action") to enforce the terms of this agreement, including any action brought by ARC, after the termination of this agreement by ARC or the Agent, to collect amounts due the carriers by the Agent.

## Section XXX: Other Agreements Superseded

This agreement shall supersede any and all prior agreements between the Agent and any carrier party to the Carrier Services Agreement concerning the issuance of ARC traffic documents for such party, including the Air Traffic Conference of America Passenger Sales Agency Agreement, except with respect to rights and liabilities thereunder existing at the date hereof.

## Section XXXI: Choice of Law

This Agreement shall be construed in accordance with, and governed by, the laws of the Commonwealth of Virginia.

ARC Form 990816

Exhibit 3
Page - 67

SECTION 6

Exhibit 3
Page - 68

## Agent Reporting Agreement

# Non-Air Transportation Travel-Related Products Sales Through ARC

EREAS, Agent and ARC desire to facilitate the sale of non-transportation, travel-related products (e.g., theme park :ts) by Agent using ARC traffic documents, with ARC as ticketing carrier, processed through Agent's regular sales rting process; and

EREAS, ARC and various Vendors (e.g., theme parks) of air transportation, travel-related products (e.g., theme admission tickets) have entered into independent ements for the purpose of facilitating the sale, by Agent, those various non-air transportation, travel-related lucts.

onsideration of the foregoing premises, and for all sales of air transportation, travel-related products where ARC has sed Agent that ARC shall be designated as the ticketing ier, Agent acknowledges, understands, and agrees that C shall be entitled to all of the rights of an ARC-icipating carrier (i.e., Carrier Services Agreement atory) under the Agent Reporting Agreement ("ARA") that all ARA provisions shall apply to ARC as if it were a ier under that Agreement with the following amendments, lifications, or clarifications:

tion V.A shall apply to ARC such that ARC shall be a eral concurrence carrier;

tion VII.G is hereby amended to include not only ARC-ed instructions, but also all instructions issued by or on alf of any Vendor participating in this program;

For purposes of Section XIV of the ARA, Section XIV.B shall control where ARC is not the ticketing carrier; Section XIV.D shall control where ARC is the ticketing carrier; —

Section XXI of the ARA shall not apply to ARC;

Section XXII of the ARA shall not apply to ARC; even though ARC may appear as the ticketing carrier, remuneration between an Agent and Vendor (e.g., theme park) of non-air transportation, travel-related products shall be determined solely by the Vendor, or by mutual agreement by the Vendor and the Agent;

Section XXIX.E of the ARA is hereby modified such that ARC may terminate Agent's participation in this program (i.e., sale of non-air transportation, travel-related products where ARC is to be the validating carrier) for any breach of the ARA, including its Attachments, Supplementary Agreements, or failure to comply with any ARC or Vendor-issued instructions related to or arising out of the use of ARC traffic documents for non-air transportation, travel-related products where ARC is to be validated as the ticketing carrier. Nothing in this Attachment shall inhibit, or in anyway interfere with, termination of Agent in accordance with the terms of the ARA.

ARC Form 990816, att. A

Exhibit 3
Page - 70

## Agent Reporting Agreement

## Security Rules for ARC Traffic
## Documents and Airline Identification Plates

roductory Note: This attachment was the subject of intense
dy by the ARC Ticket Security Working Group, comprised
representatives of AAA, American Express, ASTA, ARTA,
nerica West Airlines, Delta Air Lines and ARC. The results
this study were, in turn, reviewed by travel agents at
ecially-called meetings in Los Angeles and New York and by
RC's Joint Advisory Board, comprised of six (6) agency
presentatives and six (6) airline representatives, and adopted
/ ARC's Board of Directors in December 1995.

Note: When the rules were adopted, certain
rovisions were designated as "recommended
ractices" for certain locations approved prior to
larch 31, 1996, and such locations were exempt
om the provisions for a designated period of
me. It was planned that following the specified
eriods noted, during which experience would be
jained with the "recommended practices," such
ractices would be reviewed by the above-
eferenced Working Group. Such review of the
'recommended practices" was undertaken by the
iroup, and the designated provisions were
idopted as mandatory practices for all travel agent
ocations. However, locations which were
ipproved prior to March 31, 1996, that submit sales
eports via ARC's Interactive Agent Reporting
system (IAR), may be eligible for an exemption
rom the mandatory requirements of section VI.C
of Attachment B. The criteria for the exemption
ire published on ARC's Internet web site
[www.arccorp.com], or alternatively, they may be
obtained from ARC's Customer Support Center.]

* * *

## Part A: ARC Traffic Documents (Paper
## Format)

## Section I: Nature and Purpose

These rules have been developed by ARC to govern the
security of its traffic documents and the airline identification
plates provided to approved ARC travel agents. Adherence to
the rules protects an approved travel agent in two ways. First,
compliance with all the rules means that a travel agent will not
be held liable by ARC or the airlines for usage of traffic
documents in the event of a theft (including shoplifting,
robbery, burglary, etc.) of the documents, except by the travel
agent or its employees. Conversely, non-compliance with the
rules means that the travel agent will not be absolved from

liability by ARC for usage in the event of such theft. Second,
visible adherence to the rules will act as a deterrent to criminals,
who in many cases will inspect an agency location before
deciding to carry out the crime. An obviously secure premises
and sound business operation will deter the potential criminal,
and prevent the problems the travel agent inevitably has to deal
with following a criminal occurrence.

## Section II: Applicability

These rules apply to what are classified by ARC as accountable
documents which are as follows:

- 2-flight manual tickets;
- 4-flight manual tickets;
- Transitional Automated Tickets (TATs);
- Automated Ticket/Boarding Pass (ATBs);
- Miscellaneous Charges Orders (MCOs);
- Tour Orders; and,
- Prepaid Ticket Advice (PTAs).

All other documents supplied by ARC to travel agents are
classified by ARC as non-accountable documents and are not
subject to these rules.

The rules govern the following:

⇒ the total amount of documents a travel agency location
   may have at any one time, i.e., its total inventory (see
   section III below);

⇒ special inventory provisions for travel agents and agency
   locations on the list of ARC-approved agents for six
   months or less (see section IV below);

⇒ the amount of documents a travel agency location may
   order from ARC (see section V below);

⇒ the amount of documents a travel agency location may
   have on its premises (see section VI below);

⇒ the storage of the remaining documents off-premises, i.e.,
   reserve supply storage (see section VII below);

⇒ exceptions where travel agency locations have sufficient
   security and may store all documents on premises (see
   section VIII below);

⇒ storage of airline identification plates (see section IX
   below); and,

⇒ the security of the travel agent's approved location and
   operations (see section X below).

Attachment B

## Section III:  The Amount of Documents that an ARC-Approved Location May Have in Inventory at Any One Time

The Agent may maintain a three-month supply of traffic documents, for each authorized agency location, based on its past usage.

1.    Until such time as ARC is able to inform the Agent of its usage, by type of accountable document and on a per box basis, each calendar quarter, the Agent shall calculate such usage based on its three (3) highest consecutive months of usage in the past twelve months.

2.    When ARC completes the systems development effort necessary to inform the Agent of its usage on a calendar quarter basis, such information will be provided by ARC to the Agent on a timely basis and will establish the Agent's levels of usage.

If, as a result of extraordinary circumstances, such as physical damage to the traffic documents held in inventory, or the planned movement of a large tour group, a travel agency location requires inventory in addition to that provided for above, the Agent shall include a written request for additional supplies with its requisition form, describing the reasons why such added inventory is required and stating the amount required, as well as, if applicable, a complete listing of damaged stock and the disposition of such stock, e.g., returned, destroyed, etc.

[Note:    The Agent placing an order for additional inventory is reminded that the presence of such additional inventory exposes the agent to increased liability in the event of a theft.]

## Section IV:  Special Inventory and Security Requirements for Travel Agents and Agency Locations on the List of ARC-Approved Agents for Six Months or Less

A travel agent approved by ARC shall receive as its initial supply of traffic documents the following:

1 box of Automated Tickets
1 box, or mailing unit, of Manual Tickets
1 box, or mailing unit, of MCOs
1 box, or mailing unit, of Tour Orders
1 box, or mailing unit, of PTAs

Thereafter, and until the Agent has been included on the list of ARC-approved agents for more than six months and has established a record of usage, the travel agent's inventory will be limited to no more than two times the initial supply, detailed above. Based upon its usage and/or

approved locations, etc., an upward or downward adjustment may be made by ARC. ARC may request additional information from the agent to help evaluate stock needs.

## Section V:  The Amount of Documents that May Be Ordered from ARC

To calculate the number of boxes or mailing units of ARC documents that may be ordered, determine the allowable three (3) month inventory for each type of document and subtract the current inventory for that type of document; divide the difference by box size to arrive at the number of boxes that may be ordered.

Example:

Agent's 3 month historic usage of ATBs = 3000 Coupons
Agent's current inventory of ATBs =      -1000
                                    2000÷1000/box = 2 boxes

A non-automated travel agent location may not order automated tickets. To be reclassified as an automated location, the travel agency should refer to applicable instructions in the *Industry Agents' Handbook*.

## Section VI:  The Amount of Documents an Agency Location May Have on Its Premises

A.    Of its allowable inventory, an automated agency location may have the following on its premises:

1.    One (1) box of automated tickets in use in each ticket printer.

[Note: A ticket printer is "in use" if it is (1) operational, (2) presently connected to the agency System Provider/Ticketing System, (3) currently receiving ticketing data from the agency System Provider/Ticketing System and (4) presently printing, using established industry format, automated tickets bearing the ARC Stock Number for which the printer(s) is now configured. At a minimum, established industry format means the automated tickets will be printed in the data format transmitted by the System Provider/Ticketing System. Automated tickets must not be split, altered, changed or manipulated from their manufactured condition in order to be printed.]

2.    One (1) additional spare box of automated tickets bearing the same ARC Stock Number as those in each ticket printer in use in A.1 above. The spare box(es) must be locked up at all times.

[Note: If the System Provider/Ticketing System and/or Agent can re-configure and/or change the ticket printer(s) "in use" in A.1 above to print other

Exhibit 3
Page - 72

types of traffic documents, i.e., traffic documents bearing different ARC Stock Numbers, such other types of traffic documents in the agency inventory are considered as an Agent's Reserve Supply and may not be kept on the premises as "spares." These additional traffic documents must be stored in one of off-premises facilities described in Section VII below. If the Agent has an additional printer(s) that is inoperable or not receiving ticketing data from the agency System Provider/Ticketing System or not presently in use printing the type of automated tickets for which the ticket printer(s) is configured, such ticket printer(s) cannot be considered "in use" for purposes of counting the number of spare ticket boxes allowed on premises.]

[Note: A printer dedicated solely to printing agent coupon data on non-accountable documents shall not be considered a ticket printer for purposes of sections VI.A.1 and 2 above. In other words, if a printer is not "in use," as defined in section VI.A.1 above, and only prints agent coupon data on non-accountable traffic documents, the Agent may not order or store any accountable ARC traffic documents for that printer. A printer that has dual capability, i.e., is capable of printing accountable and non-accountable traffic documents, and is "in use," as defined in section VI.A.1 above, shall be considered a ticket printer for purposes of counting the number of accountable ARC traffic documents allowed on premises. Information pertaining to the printing of agent coupon data on non-accountable documents or plain paper is published in the *Industry Agents' Handbook*.]

3.  One (1) box, or mailing unit, each of manual tickets, MCO's, tour orders and PTA's. When not being issued, such documents must be locked up. Alternatively, with respect only to the average daily amount of manual documents issued at the location, such need not be locked up while the location is attended by agency personnel if, during this time period, the documents are subject to strict inventory standards, i.e., log-out procedures, and are kept in a separate room or area that is not readily accessible to the general public.

1.  Of its allowable inventory, a non-automated agency location may have the following manual documents on its premises:

    1.  One (1) box or mailing unit, each of manual tickets, MCO's, tour orders, and PTA's. When not being issued, such documents must be locked up. Alternatively, with respect to the average daily amount of manual documents issued at the location, such need not be locked up while the location is attended by the agency personnel if, during this time

period, the documents are subject to strict inventory standards, i.e., log-out procedures, and are kept in a separate room or area that is not readily accessible to the general public.

2.  One (1) additional box or mailing unit of manual tickets. The spare box or mailing unit must be locked up.

C.  The traffic documents referenced in sections VI.A.2 and A.3 must be locked up in a metal safe, metal filing cabinet or other metal container, under the exclusive control of the Agent, which possesses the following security features:

1.  a weight (when empty) of 200 or more pounds or permanent attachment to the floor or wall(s) of the location; and,

2.  a locking device meeting UL classification 768 (combination/timelocks).

    [Note: Section VI.C above is mandatory for all locations approved after March 31, 1995. It becomes mandatory for all locations, regardless of approval date, after January 31, 2000.

    However, locations which were approved prior to March 31, 1995, that submit sales reports via ARC's Interactive Agent Reporting (IAR) system and meet a threshold percentage of electronic ticket sales (e-ticket sales) in accordance with criteria established by ARC, may be eligible for an exemption from the mandatory requirements of section VI.C of Attachment B. The criteria for the exemption are published on ARC's internet web site (www.arccorp.com), alternatively, they may be obtained from ARC's Customer Support Center.]

## Section VII:  Storage of Remaining Inventory (Reserve Supply)

The amount of the allowable inventory for the agency location over and above that which the location may keep on the premises must be stored in one of the following off-premises storage facilities:

A.  A safe deposit box in a bank or savings and loan association; or

B.  Hotel safe; or

C.  Furrier's vault; or

D.  Jeweler's vault; or

E.  Commercial storage facilities providing storage and retrieval service for high-value and sensitive materials such as furs, art works, computer data files, or corporate records; or

ttachment B

The facilities of armored carrier and storage companies which are in the business of storing and/or transporting money, jewelry, precious metals, and other high-value items; or

Any other equivalent off-premises storage facility which the Agent describes to ARC, and which ARC approves in writing.

The Agent shall notify ARC in writing of any change in the location where remaining inventory is stored. Such notification should be sent to the Director - Field Investigations and Fraud Prevention.

If new supplies of ARC traffic documents are delivered to the Agent after the bank or other off-premises security facility is closed, the Agent shall store such ARC traffic documents in the most secure possible place, and must place them in the proper off-premises storage facility the following business day.

## ection VIII: Exceptions to the Above Rules Which Allow the Agent to Keep all Accountable Documents on the Agency Premises

The Agent may keep all ARC accountable documents at the authorized agency location provided prior written notice is given to ARC, and written approval is obtained from ARC, and the documents are secured in:

1. A walk-in steel vault; or

2. A windowless concrete-walled storage room equipped with a burglar-resistive vault door; or

3. A safe, from which all wheels and casters have been removed, and which is, and continues to be, "burglary resistant" bearing an Underwriters Laboratories (UL) classification of TL-15, TRTL-15 x 6, TL-30, TRTL-30 x 6, TRTL-60, TXTL-60, or a classification equivalent thereto; or

4. Any locked steel container or room which is protected by a burglary alarm system which meets all of the following standards:

    a. Capable of detecting promptly an attack on the outer doors, walls, floor, or ceiling of the agency location; and

    b. Designed to transmit to the police, either directly or through an intermediary, a signal indicating that any such attempt is in progress; and designed to actuate a loud sounding bell or other device that is audible inside the agency and for a distance of approximately 500 feet outside the agency; and

    c. Equipped with a visual and audible signal capable of indicating improper functioning of or tampering with the system; and

    d. Equipped with an independent source of power (such as a battery) sufficient to assure continuously reliable operation of the system for at least 80 hours in the event of failure of the usual source of power.

B. The notice required by section VIII.A, above, shall describe the on-premises storage facility in sufficient detail to show that it meets one of the foregoing requirements, and must be approved by ARC in writing.

## Section IX: Storage of Airline Identification Plates

The Agent shall store all airline identification plates in a locked, steel container separate from the on-premises supply of traffic documents.

[Note: A locked file cabinet is an appropriate container, while a locked cash box, which is portable, is not.]

## Section X: General Security of the Travel Agent's Approved Location and Operations

A. The Agent shall close, lock, or otherwise secure all means of access to the authorized agency location at all times when the location is not attended by authorized agency personnel.

[Note: The Agent may provide access to the agency location to non-agency personnel (i.e., landlord, cleaning services, independent contractors, etc.) when the location is not attended by authorized agency personnel. In so doing, however, the Agent bears responsibility for any ticket stock lost or stolen under such circumstances. It is, therefore, essential that the Agent require all non-agency personnel to close, lock, or otherwise secure all access to the location by unauthorized personnel while they are occupying it. It is suggested that the Agent examine the possibility of obtaining indemnification against any liability it incurs with ARC or its carriers as a result of acts of negligence on the part of the authorized non-agency personnel.]

B. All automated tickets not in use in a printer must be locked up, as must all manual tickets, except those that are being issued. Alternatively, with respect only to the average daily amount of manual documents issued at the location, such need not be locked up while the location is attended by agency personnel if, during this time period, the documents are subject to strict inventory standards, i.e.,

age 32

Exhibit 3
Page - 74

ut procedures, and are kept in a separate room or area
s not readily accessible to the general public.

:: A locked file cabinet or safe is an appropriate
iner, while a locked cash box, which is portable, is
Consideration should also be given to the location of
ontainer as well as the daily supply. Following bank
:dures for the issuance of traveler's checks, where the
employee goes to a non-public area to obtain only
gh checks to meet the customer's order (but no
es"), may be a worthwhile example to consider for the
nce of manual tickets by agency employees.]

rinter Location. All ticket printers must be located
separate room or area within the agency which is
ssible only to that travel agency's personnel.

:: If your agency location has more than one room or
e, it is suggested that the printer(s) be placed in the
n least accessible to the general public. If the agency
tion is primarily one room or office, a partition could
built or created with bookshelves, for example, to
rate the ticket printer(s) from access by non-agency
onnel.]

.ocking Requirement for Printer or Its Contents. All
omated ticket printers must be either (a) locked, (b)
sed in a locked container, or (c) placed in a locked
m. Alternatively, the tickets for the printer must be in a
:ed box.

. Agent must maintain daily inventory procedures. For
ual tickets, this means a log must be kept of all tickets
:ived by the Agent, with the current status of each. For
omated tickets, this means, at a minimum, the
intenance of a record of daily usage, i.e., range usage as
vided by a TINS report, as well as a daily record of
ral inspection.

ite: In connection with the visual inspection
uirement, it is suggested that the agent consider, where
propriate, marking the side of the in-line stock with a
" or a vertical line which, when inspected on a daily
is by the agent, will quickly signal whether tickets have
:n removed from the contents. Another suggestion
uld be to insert a ruler into the feed stock bin on a daily
is to verify that the volume depleted was related to the
cuments used.]

## Part B: ARC Traffic Documents
### (Electronic Format)

The Agent shall exercise reasonable care in the issuance or
disclosure of ARC traffic documents/data/numbers in an
electronic format, to prevent the unauthorized issuance or use of
such traffic documents/data/numbers. "Reasonable care"
includes effective, electronic challenge and authentication, e.g.,
PIN and password, of any user accessing agent hardware,
systems, or any other systems or hardware which can be used to
issue traffic documents/data/numbers in an electronic format.

ARC Form 99081 6, att. B

Exhibit 3
Page - 75

Exhibit 3
Page - 76

# Agent Reporting Agreement

## Personal Guaranty of Payment and Performance

### Section I: Applicability

The provisions of this attachment apply whenever the Agent is required, under the provisions of section IV.A. of the agent reporting agreement, to execute a "Personal Guaranty of Performance of Agent's Agreement."

### Section II: Guarantors

The guarantors on such guaranty shall include:

All persons having a stock or other beneficial interest of 50 percent or more in the Agent and all officers, directors, or employees having a stock or other beneficial interest of 10 percent or more in the Agent, if such is a corporation; or

Where the Agent is a corporation in which 50 percent or more of the stock or other beneficial interest is owned by another corporation(s) (hereinafter "parent corporation") then all persons, in addition to those who may meet the requirements of paragraph A above, having a stock or other beneficial interest of 50 percent or more in the parent corporation and officers, directors or employees having a stock or other beneficial interest of 10 percent or more in the parent corporation.

Each general partner and the spouse of each general partner if the Agent is a general or limited partnership;

The spouse of the Agent which is a sole proprietorship.

### Section III: Effectiveness of Guaranty

The originally executed guaranty is of continuing effect, and its effectiveness, and the guarantors' liability thereunder, survives termination of the Agents' Agent Reporting Agreement, except modified pursuant to section IV below, and need not be re-executed upon amendment of the Agent Reporting Agreement, including subsequent revisions and reissues thereof.

### Section IV: Modification of Personal Guaranty

By mutual consent of ARC and the Agent, guarantors may be added, deleted, or substituted for existing guarantors, if circumstances change, e.g., change of corporate or partnership structure, or change of spouse occurs after the guaranty has been executed.

After the guaranty has been in effect for two years, the Agent may petition the Arbiter for review of the requirement to maintain such guaranty.

### Section V: Agreement Personal Guaranty of Payment and Performance of Agent's Agreement

As a condition imposed for continued inclusion of the below listed travel agent on the agency list of the Airlines Reporting Corporation (hereinafter referred to as ARC), and/or pursuant to the terms of section IV.A.4, VIII.D, XV.A, and/or IX.B of the Agent Reporting Agreement, the undersigned guarantor(s) hereby jointly and severally promise and guaranty the unconditional payment

by Legal or Trade Name:_____
(hereinafter referred to as Travel Agent),

the home office location of which has been designated with ARC Agency Code Number_____.
Travel Agent comprising such home office and all branch, satellite ticket printer, and other locations of Travel Agent, including without limitation any location which may be added to the ARC Agency List after the date of execution hereof, of all indebtedness, liabilities and obligations of every nature and kind arising out of or in connection with the Agent Reporting Agreement as presently constituted and as may be hereinafter amended, including subsequent revisions and reissuances thereof, except to the extent that such indebtedness, liabilities or obligations are satisfied from the proceeds of the surety bond or letter of credit required under said Agent Reporting Agreement and/or are satisfied by the assets of Travel Agent itself.

Any and all disputes regarding the obligations of the undersigned guarantor(s) to ARC shall be resolved by the Travel Agent Arbiter, an arbitration forum established as an independent entity, in accordance with the rules promulgated and published by the Travel Agent Arbiter, and the decision shall be final and binding; provided, however, that neither ARC nor any guarantor is precluded from seeking judicial relief to enforce a decision of the Travel Agent Arbiter, or to compel compliance with this Personal Guaranty prior to the filing of an answer on a proceeding concerning such requirement before the Travel Agent Arbiter. Subject to the above, the Travel Agent Arbiter shall have discretion to consolidate in one docket any action concerning ARC and Travel Agent, and ARC and any or all undersigned guarantor(s).

Any assets which a spouse who executed this guaranty acquired independently of Travel Agent are excluded from the provisions of this guaranty.

Authority and consent are hereby expressly given ARC from time to time, and without any notice to the undersigned guarantor(s), to give and make such extensions, renewals,

## Attachment C

settlements, and compromises as it may deem proper with respect to any of the indebtedness, liabilities and obligations covered by this guaranty; and the release by ARC of any other person, or settlement with any other person, or the revocation or impairment of this guaranty with respect to one or more of the guarantors, shall not operate to prejudice the rights of ARC against any or all other guarantors hereunder. This guaranty shall bind the parties by whom it is signed, whether the same be signed by one or more guarantors. This guaranty may consist of several counterparts, all of which, taken together, shall constitute a single guaranty.

It is understood that this is a continuing absolute and unconditional guaranty, co-extensive with said ARC Agent Reporting Agreement as presently constituted and as may be

hereafter amended, including subsequent revisions and reissuances thereof. The undersigned guarantor(s) hereby jointly and severally waive notice of acceptance of this guaranty and of all defaults by Travel Agent of non payment and nonfulfillment of any and all of said indebtedness, liabilities, and obligations.

The execution of this guaranty shall not be construed as to create a present security interest or lien on the assets of the guarantors hereto.

This guaranty shall be construed in accordance with and governed by the laws of the Commonwealth of Virginia.

Signed and sealed by the undersigned on the date set forth below.

_____
(Printed Name of Guarantor)

_____
(Ownership or Corporate Title of Guarantor)

_____
(Residence Telephone Number)

_____
(Residence Address)

_____
(City, State, Zip Code)

_____
(Signature of Guarantor)

**This Document Must Be Signed in the Presence of a Notary**

County of _____ State of _____

On this _____ day of _____, 20___

appeared before me and, having been duly sworn by me, signed the guaranty in my presence.

**NOTARY SEAL**

*(FOR NOTARY USE ONLY)*

_____
(Print Name of Above Guarantor)

_____
Notary Public Signature

My commission expires on _____

A SEPARATE PERSONAL GUARANTY MUST BE EXECUTED BY EACH TYPE OF GUARANTOR IDENTIFIED IN SECTION II ON THE REVERSE. EACH PERSONAL GUARANTY MUST CONTAIN BOTH PAGES.

ARC Form 990816, att. C

Exhibit 3
Page - 78

Attachment D

# Agent Reporting Agreement

## Central Collection Service

### Section I: Nature and Purpose

In order to expedite the flow and payment of (1) debit memos issued by a carrier against an agent, and (2) credit request memos issued by an agent against a carrier, and to provide a uniform manner of processing such items should the Agent or carrier fail to act upon direct submissions to them within a reasonable time, there is hereby created and established within ARC the Central Collection Service (hereinafter "CCS").

### Section II: Functions of CCS

CCS shall:

- Receive credit request memos from agents;

- Receive debit memos from carriers;

- Submit the credit request memos to the appropriate carriers with a notice indicating the amount will automatically be deducted from an area settlement plan disbursement on a specified date unless either paid or contested by the carrier within a prescribed period;

- Submit the debit memos to the Agent;

- Remit the monies received from agents or carriers to the appropriate claimant;

- Promptly advise any claimant when the Agent, or the carrier, as the case may be, contests a claim;

- Take action in accordance with this Agreement if the Agent fails to remit within 30 days of receipt of a debit memo;

- Obtain payment for a credit request memo from an area settlement plan disbursement of any carrier which neither pays nor contests the credit request memo within 30 days after receipt, and remit the payment to the claimant; and

- Prescribe the forms, procedures, and notices to be utilized in performing the functions and responsibilities hereunder.

### Section III: Standards of Eligibility

A. In order for an agent to utilize CCS for the submission of credit request memos, the following standards of eligibility apply:

1. The value of the credit request memo must be at least $10;

2. The time since the initial submission of the credit request memo to the carrier shall be no less than 45 days, nor more than 18 months, and a follow-up to the carrier shall have been made at least 15 days prior to submission to CCS; and

3. The credit request memo shall not have been contested by the carrier.

B. The foregoing provisions of subsection III.A.2 above notwithstanding, nothing herein shall prevent the Agent from referring a credit request memo to ARC for processing directly with the carrier involved which is neither paid nor contested by the carrier within a reasonable period after receipt if, in the Agent's opinion, the amount of the credit request memo is of such significant value as to impair the Agent's operation if processed through CCS.

C. In order for a carrier to utilize CCS for the submission of debit memos, the following standards of eligibility apply:

1. The time since initial submission of the debit memo to the Agent for payment shall be no less than 90 days nor more than 18 months prior to submission to CCS, and a follow-up claim to the Agent shall have been submitted at least 45 days prior to submission to CCS;

2. The Agent shall not have, prior to submission to CCS, contested the claim; and

3. Debit memos must relate to ARC traffic documents issued by the Agent within the 24-month period immediately preceding the date of submission of the debit memo to CCS.

### Section IV: Contesting a Claim

A. A "contested claim" is one in which the carrier or the Agent rejects a credit request memo or debit memo, respectively, in writing with an explanation for the reason of non-payment of the item involved. This explanation must include, among other things, the basis for nonpayment, setting forth in sufficient detail and with available supporting documents the issues and questions of fact permitting a reasonable understanding of the reason for the rejection, and an expression of willingness to discuss the claim and rejection with the other party. Nonpayment of a separate claim by either party shall not constitute a basis for contesting a claim, i.e., there shall be no right of offset by either party.

Exhibit 3
Page - 79

Attachment D

A contested claim will not be eligible for submission to CCS. Should a carrier contest a credit request memo, or an agent contest a debit memo transmitted to it by CCS in accordance with the terms hereof, CCS shall withdraw the item from CCS processing, and shall return the credit request memo or debit memo to the originator accompanied by the contested claim documentation.

If in the opinion of the claimant a claim returned unpaid by CCS does not meet the definition of "contested claim", the claimant may resubmit the claim and other documentation to CCS for determination of whether the claim has been properly contested. If it is concluded that the claim has not been properly contested, the parties shall be notified thereof and afforded ten days after receipt of notice to contest the claim properly. If at the end of that ten-day period the claim has not been properly contested, CCS shall notify the parties thereof, accompanied by an explanation of the reasons for its conclusion. Such claim must be paid to CCS by the carrier or Agent within ten days after the notice from CCS to the parties advising the reasons for its conclusion. Failure by the carrier to pay within that time shall result in automatic deduction of the amount indicated on the credit request memo from that carrier's area settlement plan disbursement.

ARC Form 990816, att. D

Exhibit 3
Page - 80

## Agent Reporting Agreement

## Selection of the Ticketing Carrier

### ction I: General Rule

The Agent will use the ticketing identification of any ARC carrier scheduled to participate in the transportation.

In the event ticketing identification of a carrier scheduled to participate in the transportation is not available, the Agent will use the identification of any other ARC carrier who has provided authorization for such use.

### ction II: Clarification of "Ticketing Identification"

For preparation of a manually issued ARC traffic document (paper format), ticketing identification will be through use of the airline identification plate provided by any ARC carrier scheduled to participate in the transportation. If such an identification plate has not been provided, the identification plate of any other ARC carrier may be used provided the carrier has given authorization for such use. ("Authorization" in this instance can be either verbal or written from either the home or local office of the authorizing carrier.)

For preparation of automated ARC traffic documents (paper format) through the use of the Agent's stand-alone computer system (without interface to a carrier's computer system) ticketing identification will be determined on the same basis as for manual issuance.

For preparation of automated ARC traffic documents (paper format) through the use of a system provider (servicing carrier) or for issuance of ARC traffic documents in an electronic format:

1. Ticketing identification will be the designation of any ARC carrier scheduled to participate in the transportation which also:

a. is a signatory to the airline industry's automated ticketing agreement which authorizes a ticket to be generated in the name of the signatory airline. (A record of such signatories is maintained by the servicing carrier's computer system), and

b. has provided its airline identification plate to the Agent.

2. If no such carrier has authorized use of its name, another ARC carrier may be designated as follows:

a. The servicing carrier may be named by the Agent as the ticketing carrier even though it is not scheduled to participate in the transportation whenever such Agent is not permitted under C.1.a. above or authorized under C.1.b. above to issue an ARC traffic document in the name of any carrier participating in the itinerary; *provided*, that, the servicing carrier has an interline agreement with the carriers in the routing (determined by the servicing carrier's computer system).

b. The Agent may instruct the servicing carrier to issue an ARC traffic document in the name of a specific ticketing carrier party to the airline industry's automated ticketing agreement, on behalf of another carrier not a party to that agreement, provided such authorization has previously been given to the servicing carrier by the specific ticketing carrier. (A record of such authorization is maintained by the servicing carrier's computer system.)

ARC Form 990816, att. F

Page 39

Exhibit 3
Page - 81



## A·R·C

### Memorandum of Agreement to the
### Airlines Reporting Corporation Agent Reporting Agreement
(The text of this memorandum appears on the reverse of this form.)

MARIE A TAYLOR          ACN:   0557719 1
DBA
UNIGLOBE FAIRWAY TRAVEL

1535 EAST 17TH STREET
SANTA ANA      CA  92705

**RETURN TO ARC**
(SIGN ON REVERSE)

ARC Form 030505-01

The parties to this "Memorandum of Agreement to the Airlines Reporting Corporation Agent Reporting Agreement" are the Agent identified on the obverse of this form, Airlines Reporting Corporation (ARC), and each carrier which is or may become a party to ARC's "Carrier Services Agreement" and has appointed said Agent as its agent for the issuance of ARC traffic documents in connection with sales of air transportation and/or ancillary services. (In signing this memorandum, ARC acts on its own behalf and on behalf of each such carrier.) Each of the parties hereby agrees to be bound by the terms of ARC's "Agent Reporting Agreement" (ARC Form 030505-02 and all like-numbered attachments and supplement) and, where applicable, all supplementary agreements thereto, which are incorporated herein by reference as though fully set forth in this memorandum. Subsequent to the execution of this memorandum of agreement, the Agent may elect to transact business with ARC, including, without limitation, to confirm continued concurrence with the terms and conditions of the Agent Reporting Agreement and future amendments thereto, purchase products and services, or remit payments, through the use of electronic means, such as an electronic signature, password, access code, or personal identification number (PIN). Agent acknowledges and agrees that its use of any electronic means to transact business with ARC shall have the same force and effect as a handwritten signature, shall bind the Agent for all purposes, and shall be deemed admissible as between the parties to the same extent and under the same conditions as other business records originated and maintained in documentary form. Agent agrees not to contest the validity or enforceability of such electronic transactions, under the provisions of any applicable law, confirmed with the Agent's electronic signature, password, code, or PIN. This memorandum of agreement is effective as of May 5, 2003.

FOR COMPLETION BY AGENT IDENTIFIED ON OBVERSE OF                    AIRLINES REPORTING CORPORATION
THIS FORM

By: _____                                By: _____
    (Signature of owner or officer)

_____                                    Its: Vice President and General Counsel
    Thomas K Taylor
    (Print or type name and title)

Exhibit 3
Page - 82

EXHIBIT
2